## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE | § | CASE NO. 22-10082 |
| | § | |
| WESTBANK HOLDINGS, LLC, | § | CHAPTER 11 |
| | § | |
| DEBTOR.[1] | § | SECTION "A" |

## MEMORANDUM OPINION AND ORDER

Before the Court is

1. *Emergency Motion of Federal National Mortgage Association d/b/a Fannie Mae To Appoint a Chapter 11 Trustee* (the "Trustee Motion"), [ECF Doc. 86], and the

   a. Joinders filed by

      i. Certain tenants and the New Orleans Renters Rights Assembly, [ECF Doc. 93],

      ii. Federal Housing Finance Agency, [ECF Doc. 135], and

      iii. Sewerage & Water Board of New Orleans, [ECF Doc. 138].

   b. Oppositions filed by

      i. The Debtors, [ECF Doc. 291], and

      ii. Joshua Bruno; Metro-Wide Apartments, LLC; Metro-Wide Apartments II, LLC; WHB Servicing, LLC; Downtown Development Group, LLC; Bruno, Inc.; and MW Servicing LLC, [ECF Doc. 290].

   c. Post-trial briefs and reply briefs filed pursuant to this Court's June 17, 2022 Order, [ECF Doc. 356] and received from

      i. Federal National Mortgage Association d/b/a Fannie Mae, [ECF Docs. 401 & 413],

      ii. Certain tenants and the New Orleans Renters Rights Assembly, [ECF Docs. 402 & 417],

---

[1]     Jointly administered with Cypress Park Apartments II, LLC (No. 22-10083); Liberty Park Apartments, LLC (No. 22-10084); Forest Park Apartments, LLC, (No. 22-10085); Washington Place, LLC (No. 22-10086); and Riverview Apartments, LLC (No. 22-10176).  Unless otherwise specified, docket citations reference documents filed in the main case, Westbank Holdings, LLC (No. 22-10082).

      iii.   Sewerage & Water Board of New Orleans, [ECF Docs. 405 & 418],

      iv.   The Debtors, [ECF Docs. 404 & 416], and

      v.   Joshua Bruno; Metro-Wide Apartments, LLC; Metro-Wide Apartments II, LLC; WHB Servicing, LLC; Downtown Development Group, LLC; Bruno, Inc.; and MW Servicing LLC, [ECF Docs. 403 & 419].

After the parties conducted extensive discovery, the Court held a four-day evidentiary hearing to consider the Trustee Motion on June 9, 10, 13, and 14, 2022. This Court's Order of June 17, 2022, identifies all witnesses who testified and all exhibits admitted into evidence. [ECF Doc. 356]. Considering the evidence presented at the hearing, applicable law, and the record in this case, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014 and **GRANTS** Fannie Mae's Trustee Motion.[2]

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334(b) and the standing order of reference of the District Court. The matter presently before the Court constitutes a core proceeding that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2). The venue of each of the jointly administered Debtors' cases is proper under 28 U.S.C. §§ 1408 and 1409.

## FINDINGS OF FACT

### A.    Organizational Structure of Debtors

1.    Each of the six Debtors is a holding company for multifamily apartment buildings and provides subsidized-rental housing for low-income families in the greater New Orleans area. The Debtors collectively provide approximately 500 rental units.

---

[2]    To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed as findings of fact.

2.     In December 2014, Joshua Bruno ("Bruno") purchased the properties now held by five of the Debtors, each pursuant to a Multifamily Loan and Security Agreement and Multifamily Note.  Bruno purchased the properties held by Westbank Holdings, LLC in March 2018 pursuant to a Multifamily Loan and Security Agreement and Multifamily Note.  Fannie Mae holds those notes and a perfected mortgage, assignments of leases and rents, and security agreement on the properties held by each of the six Debtors.

3.     The Debtors do not have employees.  Bruno is the sole managing member of each of the Debtors.  Bruno utilizes other of his wholly owned non-Debtor affiliates to manage the Debtors' businesses:  Metro-Wide Apartments, LLC and Metro-Wide Apartments II, LLC (together, "Metrowide") oversee property management and leasing; Downtown Development Group, LLC ("DDG") performs, directs, and manages all repairs and capital improvements for the Debtors; WBH Servicing, LLC employs personnel who work at apartments held by Westbank Holdings, LLC; and MW Servicing LLC employs personnel who work at apartments held by the other five Debtors.  Bruno is the sole managing member for each of those non-Debtor affiliates.[3]

4.     DDG is not a licensed contractor, but, on behalf of each Debtor, Bruno entered into master contracts with DDG to serve as the exclusive contractor and insurance claims consultant. *See* Hr'g Tr. 297:10–300:25 (June 9, 2022); FM Ex. 166.

B.     **The Debtors' Prepetition History**

5.     Joel Shaddox, who possesses a background in handling distressed commercial assets and currently serves in Special Asset Management for Fannie Mae, testified on behalf of

---

[3]     In August 2021, three weeks prior to the date Hurricane Ida made landfall in Louisiana, Bruno, on behalf of Metrowide and Westbank Holdings II, LLC entered into joint venture agreements with Certain Property Management, LLC to manage the Debtors' properties.  *See* Debtors Exs. 38 & 39.  Bruno, as Project Manager of the joint venture, maintained responsibility and "full final decision-making authority for the performance of this contract, overseeing the management, and reporting to and implementing the instructions of the Joint Venture."  Debtors Ex. 38, § 2.1; Debtors Ex. 39, § 2.1.

Fannie Mae. *See* Hr'g Tr. 62:3–24 (June 9, 2022). The Court found Shaddox to be an extremely competent and earnest witness and gives maximum weight to his testimony.

6.      Fannie Mae utilizes Property Condition Assessments ("PCAs") to monitor the condition of multi-family properties serving as collateral for repayment of loans it has made to its borrowers. *See* Hr'g Tr. 191:16–193:17 (June 9, 2022). Professionals retained by Fannie Mae to inspect properties and prepare PCAs review various systems on individual properties, including general housekeeping, grading and drainage, environmental concerns, parking areas, building exteriors, roof systems, foundation/basements, mechanical systems, plumbing, electrical systems, fire/life safety equipment, pest infiltration or unsanitary living conditions, common areas, and seismic concerns, and rate each based upon objective criteria to reach an overall rating. *See* FM Exs. 1–8, 154–156.

7.      The Court adopts Shaddox's straightforward explanation of the PCA rating system used by Fannie Mae:

> So a 1 [rating] is the best number. I've honestly never seen a 1. It's typically from what I understand a brand-new property that's got absolutely no issues. 2's, I've seen a couple of 2's. They notate some minor deferred maintenance, but typically no life/safety concerns. 3 [rating] is . . . obviously there's some issues that are getting to the point that they need to be addressed or they could get worse. It could also include life/safety issues as well.
>
> 4 [rating]—a lot of the PCAs that I see are 4's. They're bad. They've got . . . safety issues; they've got critical items that need to be addressed immediately. [They are] just a sign that the properties are not being cared for.
>
> And then on the far end of the spectrum there's a 5 [rating]. And we affectionately refer to those as a unicorn, because they don't happen very often.

Hr'g Tr. 66:16–67:5 (June 9, 2022).

8.      As of October 15, 2014, just prior to Bruno's purchase of the properties that are currently held by five of the Debtors (excluding Westbank Holdings, LLC), Fannie Mae obtained

PCAs reflecting the following overall ratings:  (i) Cypress Park Apartments II, LLC, rated "2", *see* FM Ex. 154; (ii) Forest Park Apartments, LLC, Liberty Park Apartments, LLC, and Washington Place Apartments, LLC, each rated "2", *see* FM Ex. 155; and (iii) Riverview Apartments, LLC, rated "2", *see* FM Ex. 156.

9.      On October 28, 2020, Hurricane Zeta made landfall in Louisiana as a Category 3 hurricane.

10.      As of March/April 2021, PCAs obtained by Fannie Mae reflected the following overall ratings on each of the Debtors' properties:  (i) Cypress Park Apartments II, LLC, rated "4", *see* FM Ex. 2; (ii) Forest Park Apartments, LLC, Liberty Park Apartments, LLC, and Washington Place Apartments, LLC, rated "3", "3" and "4" respectively, *see* FM Ex. 1; (iii) Riverview Apartments, LLC, rated "3", *see* FM Ex. 3; and (iv) Westbank Holdings, LLC, rated "4", *see* FM Ex. 4.[4]

11.      In April 2021, Fannie Mae initiated state court foreclosure proceedings against five of the Debtors.  *See* Hr'g Tr. 64:15–20 (June 9, 2022); FM Ex. 18.

12.      On August 29, 2021, Hurricane Ida made landfall in Louisiana as a Category 4 hurricane.

13.      On or about October 14, 2021, Bruno caused "Washington Gardens, LLC" to negotiate an insurance proceeds check dated October 13, 2021, in the amount of $100,000.00 made payable to "Westbank Holdings, LLC and Fannie Mae ISAOA ATIMA c/o Greystone Servicing Company LLC" without co-payee Fannie Mae's knowledge, endorsement, or consent.  *See* FM Ex. 376; Hr'g Tr. 73:23–78:8 (June 9, 2022).

---

[4]      The properties owned by Westbank Holdings, LLC are two buildings operated as Oakmont Apartments.

14. On or about October 14, 2021, Bruno caused "Washington Gardens, LLC" to negotiate an insurance proceeds check dated October 13, 2021, in the amount of $100,000.00 made payable to "Cypress Park Apartments II, LLC and Fannie Mae ISAOA ATIMA c/o Greystone Servicing Company LLC" without co-payee Fannie Mae's knowledge, endorsement, or consent. *See* FM Ex. 377; Hr'g Tr. 73:23–78:8 (June 9, 2022).

15. On or about November 2, 2021, Bruno negotiated an insurance proceeds check dated October 29, 2021, in the amount of $400,000.00 made payable to "Westbank Holdings, LLC and DBA Oakmont Apartments and Fannie Mae, Its Successors and or assigns ATIMA c o Greystone Servicing Co. LLC" without co-payee Fannie Mae's knowledge, endorsement, or consent. *See* FM Ex. 378; Hr'g Tr. 73:23–78:8 (June 9, 2022).

16. On or about November 2, 2021, Bruno caused "Washington Gardens, LLC" to negotiate an insurance proceeds check dated October 29, 2021, in the amount of $200,000.00 made payable to "Cypress Park Apartments II, LLC, and CN-0000804-04 (all locations): Fannie Mae ISAOA ATIMA and c/o Greystone Servicing Company LLC" without co-payee Fannie Mae's knowledge, endorsement, or consent. *See* FM Ex. 379; Hr'g Tr. 73:23–78:8 (June 9, 2022).

17. Fannie Mae learned of those four insurance proceeds checks totaling $800,000.00 in November 2021 after Bruno unilaterally negotiated the checks and deposited the proceeds into the Debtors' accounts. *See* Hr'g Tr. 76:3–6 (June 9, 2022). Bruno admitted that he caused those checks to be negotiated by the Debtors without Fannie Mae's knowledge, endorsement, or consent and asserted that the insurance proceeds were used to pay non-Debtor insider DDG for repairs to the properties held by the Debtors. *See* Hr'g Tr. 273:8–276:6 (June 9, 2022).

18. Bruno and non-Debtor affiliate DDG spent those proceeds, but to date have not provided **any** receipts for materials, cancelled checks, or other primary-source support showing

6

how the $800,000 in insurance proceeds were spent. *See* Hr'g Tr. 169:11–174:6 (June 9, 2022). Fannie Mae has been provided only after-the-fact invoices generated by non-Debtor insider DDG, each including a 23% mark-up for materials and 13% mark-ups for both overhead and profit. *See id.*; FM Ex. 165. DDG's bank statements for November and December 2021 reveal checks made payable to "Cash" or to Bruno personally in amounts ranging from $20,000 to $35,000 and totaling over $100,000; no explanation was given for the purpose of those payments. *See* FM Ex. 170.

19. On December 16, 2021, Fannie Mae and five of the Debtors, as well as certain tenants of the Debtors who had intervened in the state court foreclosure proceedings, entered into a temporary Consent Judgment pending a final, binding resolution on or before January 4, 2022. *See* FM Ex. 18. The Consent Judgment provided that, if no final, binding resolution was reached by January 4, 2022, the state court would issue a ruling in the foreclosure proceedings on January 19, 2022. *See id.* Among other requirements, the Consent Judgment provided that all insurance checks issued, sent, or submitted to the Debtors to repair damages to any of the Debtors' properties were to be presented to Fannie Mae for endorsement and negotiation and the proceeds were to be deposited into the state court's registry. *See id.* The Consent Judgment also required Fannie Mae and the state court review for approval any proposals for critical repairs to any of the Debtors' properties. *See id.*

20. On December 17, 2021, state court counsel for Cypress Park Apartments II, LLC sent an e-mail request to Fannie Mae for permission to make two units habitable. *See* FM Ex. 65. Counsel attached an estimate by non-Debtor affiliate DDG, an unlicensed contractor, as well as two licensed third-party contractors suggested by the Debtor's insurer. *See id.* The bid from DDG was approximately $100,000 higher than the other two bids. *See id.* Upon review of the bids, Fannie Mae approved the expenditure of $60,000 to renovate the two units, an amount

7

approximately $38,000 more than the quotes offered by the insurer's contractors, but approximately $50,000 less than DDG's bid.  *See* Hr'g Tr. 183:22–184:20 (June 9, 2022).

### C.    The Debtors' Bankruptcy Filings and Retention and Use of Professionals

21.    On January 27, 2022, five Debtors each filed a petition for bankruptcy relief under chapter 11 of the Bankruptcy Code.  [No. 22-10082, ECF Doc. 1; No. 22-10083, ECF Doc. 1; No. 22-10084, ECF Doc. 1; No. 22-10085, ECF Doc. 1; No. 22-10086, ECF Doc. 1].  On February 23, 2022, the sixth Debtor, Riverview Apartments, LLC filed a petition for bankruptcy relief under chapter 11 of the Bankruptcy Code.  [No. 22-10176, ECF Doc. 1].

22.    The Debtors are each designated as single-asset real estate entities.  [ECF Doc. 188].

*Certified Public Accountant and Special Counsel*

23.    On February 11, 2022, the Court granted on an interim basis the Debtors' motion to retain a Certified Public Accountant ("CPA") to assist the Debtors "in maintaining its accounting records, preparing and confirming a Plan of Reorganization, and preparing monthly operating reports."  [ECF Docs. 22 & 27].  On March 29, 2022, the Court entered an Order approving the CPA's retention on a final basis.  [ECF Doc. 91].

24.    On April 14, 2022, after resolution of objections, the Court approved the Debtors' retention of the law firm of Alvendia, Kelly & Demarest, LLC to serve as special counsel to pursue the Debtors' insurance claims related to damage caused by Hurricane Ida or theft or vandalism claims occurring thereafter.  [ECF Docs. 60 & 129].

*Construction Manager*

25.    On May 9, 2022, after resolution of objections, the Court approved the Debtors' request to employ Hernandez Consulting, Inc. ("Hernandez") to perform "preconstruction"

services, that is, to perform site inspections, provide an itemized proposed budget and scope of work, and recommend licensed trade contractors to perform repair work on the Debtors' properties. [ECF Docs. 140, 185 & 199]. The Court later approved the retention of Hernandez to serve as Construction Manager and Bruno's agent to oversee and renovate the Debtors' properties. [ECF Docs. 200 & 385].

26.     Steven Buell testified as a construction project manager and representative of Hernandez on the third day of the evidentiary hearing. The Court found Buell to be a reliable and compelling witness and gives much weight to his testimony and recommendations.

27.     Buell has inspected a sampling of units at the Debtors' properties and will be Hernandez's point person for all of the Debtors' construction and renovation projects. *See* Hr'g Tr. 98:9–99:17 (June 13, 2022). He described the damage and rehabilitation needs at each of the Debtors' properties, which tracked with the March/April 2022 Property Condition Reports obtained by Fannie Mae, discussed in detail below. *See* Hr'g Tr. 100:18– 168:15 (June 13, 2022). Buell was also candid regarding the difficulties ahead for the properties' renovations, particularly, the licenses, time commitments, and other considerations involved in mold remediation as well as supply-chain and staffing issues. *See id*. Buell gave a preliminary estimate of $60,000 per unit for renovating the Debtors' uninhabitable units—if no structural repairs are required. *See id*.

28.     Buell witnessed no evidence of demolition or renovation projects at any of the Debtors' properties. *See* Hr'g Tr. 147:23–148:14 (June 13, 2022). He also observed indicators of possible structural issues at the Debtors' properties. *See* Hr'g Tr. 149:6–15 (June 13, 2022).

*Chief Restructuring Officer*

29.     On May 23, 2022, after resolution of objections, the Court approved the Debtors' request to retain Richard W. Cryar of F M Reed Company, LLC, to serve as Chief Restructuring

Officer ("CRO") for the Debtors. [ECF Docs. 169, 254 & 257]. The amended employment agreement approved by the Court indicates that the majority of duties and powers of the CRO are "subject to the approval and consent of" or subject to the "discretion" of Bruno as the member-manager of the Debtors. [ECF Doc. 254]; FM Ex. 732; Hr'g Tr. 59:6–60:7 (June 13, 2022). The scope of Cryar's employment agreement does not include evaluation of any preferential transfers or payments to insiders by or among the Debtors. [ECF Doc. 254]; FM Ex. 732; Hr'g Tr. 64:8–15 (June 13, 2022).

30. Cryer testified on the third day of the evidentiary hearing that, as CRO, he considers his role to be that of an advisor or consultant. *See* Hr'g Tr. 51:9–13 (June 13, 2022). He estimated that, to reorganize and move forward as a going concern, the Debtors' first priority is to "put the assets that they have back in commerce to demonstrate that they can generate cash flow," and then "work on either refinancing or some other form of financing the deal." Hr'g Tr. 53:13–54:3 (June 13, 2022). After reviewing the Debtors' available monthly operating reports, "some insurance claims that they've made," a general balance sheet, and income statements provided to him, he estimated that, based on the Debtors' cash on hand, the Debtors could make monthly payments to Fannie Mae as required under 11 U.S.C. § 362(d)(3) and survive approximately six months before they will be forced to seek alternative sources of income. *See* Hr'g Tr. 52:15–53:12 (June 13, 2022).

31. But Cryar believes that "raising fresh capital" would not be an available option to the Debtors, as "no traditional bank or traditional insurance company, real estate lending arm would lend into this project." Hr'g Tr. 55:15–25; 63:21–64:7 (June 13, 2022). Cryar's vision for the Debtors' restructuring does not include any projected insurance proceeds. *See* Hr'g Tr. 53:13–54:3; 58:7–10 (June 13, 2022).

32.     On cross-examination, Cryer admitted that, as CRO, he would not be required to perform any audit, review, or compilation of the Debtors' financial condition and would not test the Debtors' financials in any way.  *See* Hr'g Tr. 60:11–21 (June 13, 2022).  He had not toured any of the Debtors' properties and has no knowledge of current occupancy levels or current revenues.  *See* Hr'g Tr. 60:22–61:8 (June 13, 2022).  And although Cryar acknowledged that his plan for reorganization would depend upon the Debtors' ability to generate income, which necessarily requires the buildings to be habitable, he had not consulted with anyone from Hernandez regarding the scope of the renovations required or whether the Debtors' cash on hand will cover the costs of those renovations.  *See* Hr'g Tr. 61:9–62:11 (June 13, 2022).

33.     Cryar's knowledge and experience in the areas of corporate restructuring and financial management provide him the ability to speak honestly of the limited financial options available to these Debtors; however, the Court found him to be generally disengaged and disconnected from the Debtors' reorganization process.

*Property Manager and Leasing Agent*

34.     On June 6, 2022, after resolution of objections, the Court approved the Debtors' request to employ Trinity Property Management, LLC d/b/a Trinity Multifamily ("Trinity") to serve as property manager and leasing agent for the Debtors.   [ECF Docs. 170, 204, 223 & 298].

35.     Dave Pinson, Trinity's President, CEO, and managing-member, testified on the second day of the evidentiary hearing.  Trinity has experience in accepting clients that own properties with extensive damage and low occupancy rates.  *See* Hr'g Tr. 67:18–68:1 (June 10, 2022).

36.     Pinson described an internal document used by Trinity that outlines the transition timeline when Trinity accepts a new client in the property management industry.  *See* Hr'g Tr.

11

62:22–67:16;  72:1–8;  80:22–81:10;  Debtors  Ex.  61.    Although  Trinity  has  assembled  a

management team to handle the Debtors' accounts, which Pinson described as one of the events

that happens on "Day 1" of the Trinity transition timeline, Trinity has not been able to proceed to

any "Day 2" events or beyond, such as obtaining Debtors' bank account information and authority

to deposit rents or training staff in specific software training that will be used to operate the

Debtors' properties.  *See* Hr'g Tr. 62:22–67:16; 72:1–8; 80:22–81:10; Debtors Ex. 61.

37.    Although  Pinson's  and  his  company's  credentials  and  reputation  in  property

management are impressive, the Debtors must have habitable, income-producing units to benefit

from Trinity's services.  Thus, the Court finds Pinson's testimony to be of little help to determine

the matter at hand.

**D.     The Debtors' Statements of Financial Affairs and Monthly Operating Reports**

38.    On February 18, 2022, Westbank Holdings, LLC filed a *Statement of Financial

Affairs  for  Non-Individuals  Filing  for  Bankruptcy*  ("SOFA")  listing  a  transfer  to  non-Debtor

affiliate DDG within ninety days of the filing of its petition for bankruptcy relief in the amount of

$884,278.00, and transfers to insiders within a year of the filing of its petition in the total amount

of $994,561.49.  [ECF Doc. 44].  Under "[p]ayments, distributions, or withdrawals credited or

given to insiders" within a year of filing, the SOFA listed transfers totaling $1,827,764.18.  *See id.*

39.    On June 6, 2022, Westbank Holdings, LLC amended its SOFA and listed a transfer

to non-Debtor affiliate DDG within ninety days of the filing of its petition for bankruptcy relief in

the amount of $869,050.19, and transfers to insiders within a year of the filing of its petition in the

total amount of $996,811.49.  [ECF Doc. 310].  Under "[p]ayments, distributions, or withdrawals

credited or given to insiders" within a year of filing, the amended SOFA listed transfers totaling

$1,865,861.68.  *See id.*

40.    On February 18, 2022, Cypress Park Apartments II, LLC also filed a SOFA listing a transfer to non-Debtor affiliate DDG within ninety days of the filing of its petition for bankruptcy relief in the amount of $46,006.00, and transfers to insiders within a year of the filing of its petition in the total amount of $582,338.26.   [No. 22-10083, ECF Doc. 25].   Under "[p]ayments, distributions, or withdrawals credited or given to insiders" within a year of filing, the SOFA listed transfers totaling $629,074.47.   *See id.*   On June 6, 2022, Cypress Park Apartments II, LLC amended its SOFA to increase the total amount of and transfers to insiders within a year of the filing of its petition to $583,068.51.   [No. 22-10083, ECF Doc. 40].

41.    On February 18, 2022, Liberty Park Apartments, LLC filed a SOFA listing a transfer to non-Debtor affiliate DDG within ninety days of the filing of its petition for bankruptcy relief in the amount of $2,640.00, and transfers to insiders within a year of the filing of its petition in the total amount of $61,221.11.   [No. 22-10084, ECF Doc. 25].   Under "[p]ayments, distributions, or withdrawals credited or given to insiders" within a year of filing, the SOFA listed transfers totaling $58,362.01.  *See id.*   On June 6, 2022, Liberty Park Apartments, LLC amended its SOFA to include an exhibit, but made no changes to the disclosures of insider and affiliate transfers.  [No. 22-10084, ECF Doc. 40].

42.    On February 18, 2022, Forest Park Apartments, LLC filed a SOFA listing a transfer to non-Debtor affiliate DDG within ninety days of the filing of its petition for bankruptcy relief in the amount of $42,724.00, and transfers to insiders within a year of the filing of its petition in the total amount of $168,188.77.  [No. 22-10085, ECF Doc. 25].   Under "[p]ayments, distributions, or withdrawals credited or given to insiders" within a year of filing, the SOFA listed transfers totaling $210,912.37.  *See id.*   On June 6, 2022, Liberty Park Apartments, LLC amended its SOFA to

include an exhibit, but made no changes to the disclosures of insider and affiliate transfers. [No. 22-10085, ECF Doc. 39].

43.     On February 18, 2022, Washington Place, LLC filed a SOFA listing a transfer to non-Debtor affiliate DDG within ninety days of the filing of its petition for bankruptcy relief in the amount of $3,440.00, and transfers to insiders within a year of the filing of its petition in the total amount of $173,519.52. [No. 22-10086, ECF Doc. 25]. Under "[p]ayments, distributions, or withdrawals credited or given to insiders" within a year of filing, the SOFA listed transfers totaling $176,959.52. *See id.* On June 6, 2022, Washington Place, LLC amended its SOFA to include an exhibit, but made no changes to the disclosures of insider and affiliate transfers. [No. 22-10086, ECF Doc. 40].

44.     On March 18, 2022, Riverview Apartments, LLC filed a SOFA listing a transfer to non-Debtor affiliate Metrowide within ninety days of the filing of its petition for bankruptcy relief in the amount of $7,663.54, and transfers to insiders within a year of the filing of its petition in the total amount of $255,437.79. [No. 22-10176, ECF Doc. 26]. Under "[p]ayments, distributions, or withdrawals credited or given to insiders" within a year of filing, the SOFA listed transfers totaling $258,591.79. *See id.* On June 6, 2022, Riverview Apartments, LLC amended its SOFA to increase the total transfers to insiders and affiliates within one year of filing its petition to $263,101.33. [No. 22-10176, ECF Doc. 51].

45.     The Debtors' latest monthly operating reports show that the largest Debtor, Westbank Holdings, LLC, and others are operating at a significant loss, with the rest just breaking even. [No. 22-10082, ECF Doc. 441; No. 22-10083, ECF Doc. 42; No. 22-10084, ECF Doc. 42; No. 22-10085, ECF Doc. 41; No. 22-10086, ECF Doc. 42; No. 22-10176, ECF Doc. 53].

46.     To date, the Debtors have filed no proposed plan of reorganization.  On June 28, 2022, this Court issued an order extending the 120-day exclusive period to file a plan of reorganization; the deadline for five of the Debtors is August 5, 2022, and the deadline for the sixth Debtor, Riverview Apartments, LLC,  is September 1, 2022.  [ECF Doc. 379].

### E.     Post-Petition Condition of the Debtors' Properties

47.     On February 24, 2022, Sedgwick Claims Management Services, Inc. provided a report concerning the adjustment of Westbank Holdings, LLC's claim for damage caused by Hurricane Ida and proposed an adjustment for the Oakmont Apartments in the amount of $9,368,656.92, noting that $5,092,422.84 had already been paid to that Debtor to date.  *See* Debtors Ex. 30.

48.     As of March/April 2022, PCAs obtained by Fannie Mae reflected the following overall ratings on each of the Debtors' properties:  (i) Cypress Park Apartments II, LLC, rated "5", *see* FM Ex. 6; (ii) Forest Park Apartments, LLC, Liberty Park Apartments, LLC, and Washington Place Apartments, LLC, each rated "5", *see* FM Ex. 7; (iii) Riverview Apartments, LLC, rated "5", *see* FM Ex. 8; and (iv) Westbank Holdings, LLC rated "5", *see* FM Ex. 5.[5]

---

[5]     In April 2022, Bruno also engaged a company on behalf of Westbank Holdings, LLC to prepare a PCA for the Oakmont Apartments.  *See* FM Ex. 9.  The inspector of the properties and author of that PCA, Robert Reardon, testified on behalf of the Debtors at the evidentiary hearing.  Reardon did not qualify as an expert witness.  His PCA rated Westbank Holdings, LLC's properties overall as a "3", and he testified that the Oakmont Apartments have "some . . . deferred maintenance issues and critical repair items."  *See* FM Ex. 9; Hr'g Tr. 237:9–17 (June 10, 2022).  But Reardon's testimony revealed that he relied on Bruno's self-serving or false statements and omissions in reaching his conclusions and he further admitted that he did not author some parts of the PCA.  *See* Hr'g Tr. 252:13–265:12 (June 10, 2022).  Further, Reardon's lowball cost estimations to repair "down" units, *i.e.*, completely uninhabitable units due to extensive water damage and mold, were not credible by common-sense standards, much less when compared to the testimony and cost estimates given by Steven Buell, the construction project manager for Hernandez. *Compare* Hr'g Tr. 66:12–88:10, 97:5–169:5 (June 13, 2022), *with* Hr'g Tr. 252:13–265:12 (June 10, 2022). Reardon conceded that higher repair costs would drive a higher overall rating of the condition of the properties.  *See* Hr'g Tr. 262:6–9 (June 10, 2022)   Thus, the Court affords little to no weight to Reardon's testimony and his PCA.

49.     Christopher Davis, part-owner, manager, and property inspector for F3, Inc., inspected and prepared the March/April 2022 PCAs on each of the Debtors' properties and testified as to the condition of the properties as of that time.  *See* Hr'g Tr. 189:15–267:4 (June 9, 2022); FM Exs. 5–8.  The Court found Davis to be a highly credible witness and gives maximum weight to his testimony.

50.     As of March 2022, Westbank Holdings, LLC's properties were in deplorable condition, most unfit for habitation, with active internal and external plumbing leaks and damage, excessive black mold growth throughout (on the surfaces of walls as well as inside the walls and ceilings), collapsed drywall on walls and ceilings, and standing sewage water inside and outside both vacant and occupied units.  *See* Hr'g Tr. 200:25–214:19; FM Ex. 5.[6]  Davis testified that the

---

[6]     Words on a page here cannot capture the condition of these properties.  Referring to Photo 146 of the walkway between Westbank Holdings, LLC's two buildings, incorporated into the March 2022 PCA, Davis reported:

> So this was pretty typical around these two buildings and where we had the sanitary sewer water standing and ponding.  This is probably one of the more elaborate bridges, if you will, for tenants to walk between buildings.  And there was a gal that approached me, who said that she went out and spent her own money on plywood to put down in this location here so that her kids could get access to their dwelling unit without stepping in sewer water.
>
> And there were other makeshift bridges in areas across the property on this end, where these buildings were affected.  And they—you know, people had used everything . . . it looked like slats from the picket fence . . . from the property, just old pieces of lumber . . . I think there might have been a mattress, but just for people to gain access to their unit, they had to build these bridges so they weren't stepping in this sanitary sewer water.

Hr'g Tr. 209:4–23 (June 9, 2022); FM Ex. 5.  Similarly, Shaddox testified as to what he saw and photographed and videoed outside and inside units of the Oakmont Apartments in March 2022:

> That's some of the raw sewage we had to traverse during the site inspection.  Actually ended up going into this unit that's on the left with the boarded-up window.  It was not actually reflected as vacant or down on the rent roll, but the tenant invited us in.
>
> And the same water that you see in this photograph was also present inside his unit. . . . He was wearing flip flops because there was some of this standing sewage water insider his unit and so it was just—it was striking.

*See* Hr'g Tr. 90:14–25 (June 9, 2022); FM Ex. 150-D; *see also* FM Ex. 150-E.  Shaddox testified that, in his years of managing distressed commercial assets, he had never seen families having to walk through raw

extent of the damage due to water and sewage water infiltration—as examples, the sheer amount of black mold growing in units or the fact that floor joists from second-floor units have dropped into the first-floor units—was purely a function of the significant amount of time that maintenance in those units had been deferred. *See* Hr'g Tr. 210:8–211:7 (June 9, 2022).

51.     As of March 2022, Cypress Park Apartments II, LLC's property was also suffering from widespread neglect, including mold growth and water damage in a significant number of occupied and unoccupied units. *See* Hr'g Tr. 214:23–219:17 (June 9, 2022); FM Ex. 6.

52.     As of March 2022, although the metal roof at the Liberty Park Apartments, LLC property showed no damage, ripped tarps covered both flat roofs on the buildings held by Forest Park Apartments, LLC, and Washington Place, LLC. *See* Hr'g Tr. 219:18–223:17; FM Ex. 7. A makeshift lean-to had been constructed underneath the tarps to encourage water to drain off the tarps, but the wind had blown the tarps off and water had been allowed to pool on the roofs. *See* Hr'g Tr. 219:18–223:17; FM Ex. 7.   All three properties suffered from a significant amount of mold growth. *See* Hr'g Tr. 224:12–226:8 (June 9, 2022).

---

sewage to get to their homes. *See* Hr'g Tr. 116:6–13 (June 9, 2022).  When asked how he felt to witness that, Shaddox replied:

> I—you know, I struggled to come up with words to describe how I felt, but it's just horrible.  I wouldn't want anybody living in those conditions at all, especially children. Especially people that are put in a position where they can't afford to get out.
>
> There is—as I understand it in New Orleans, there is not enough affordable units to fit the need.  So if these properties were in good shape, they'd be full in my opinion and they're not, so.  But these people don't have anywhere else to go.  Just a bit disheartening to say the least.

Hr'g Tr. 116:14–24 (June 9, 2022).

53.     As of April 2022, the Riverview Apartments, LLC property likewise suffered from life/safety, critical, and deferred-maintenance problems, including the presence of trash, active leaks, standing water, and mold growth.  *See* Hr'g Tr. 226:10–232:25 (June 9, 2022).

54.     Very minimal actions—only roof-patching—were taken to mitigate damages and repair the Debtors' properties in the months between Hurricane Ida and March/April 2022.  *See* Hr'g Tr. 201:21–203:24; 214:8–20; 215:23–219:17; 234:20–235:2; 257:14–24 (June 9, 2022). Indeed, the post-Hurricane Ida tarping was completed by BlueSky, a roofing and tarping company whose services were paid directly by Sedgwick Claims Management Services, Inc.  *See* Hr'g Tr. 213:2–214:16 (June 14, 2022).  But DDG issued daily progress reports **identical** to those issued by BlueSky and then invoiced Westbank Holdings, LLC for the same work.  *Compare, e.g.*, FM Ex. 537, *with* FM Ex. 304; *see also* FM Ex. 165, at 7.

55.     At the March/April 2022 inspections of all of the properties, no one from the Debtors accompanied Davis and his team.  *See* Hr'g Tr. 233:1–5 (June 9, 2022).  Large discrepancies existed—and continue to exist—in the accuracy of the rent rolls, making it impossible to tell which units at each property are vacant or leased.  *See* Hr'g Tr. 233:1–234:19 (June 9, 2022).

56.     On April 26, 2022, the City of New Orleans issued a press release announcing that it "ha[d] partnered with stakeholder organizations to relocate residents of Oakmont Apartments to transitional housing due to the unsuitable and hazardous conditions."  [ECF Docs. 166 & 356].

F.     **The Debtors' Interactions with Creditors**

*Fannie Mae*

57.     Fannie Mae filed the following proofs of claim in the Debtors' cases:  (i) Proof of Claim No. 11, filed on May 31, 2022, in the Westbank Holdings, LLC case, No. 22-10082,

18

asserting a secured claim in the amount of $30,437,231.80; (ii) Proof of Claim No. 9, filed on May 31, 2022, in the Cypress Park Apartments II, LLC case, No. 22-10083, asserting a secured claim in the amount of $3,118,039.23; (iii) Proof of Claim No. 7, filed on May 31, 2022, in the Liberty Park Apartments, LLC case, No. 22-10084, asserting a secured claim for $2,306,773.10; (iv) Proof of Claim No. 6, filed on May 31, 2022, in the Forest Park Apartments, LLC case, No. 22-10085, asserting a secured claim for $2,306,773.10; (v) Proof of Claim 7, filed on May 31, 2022, in the Washington Place, LLC case, No. 22-10086, asserting a secured claim for $2,306,773.10; and (vi) Proof of Claim No. 8, filed on May 31, 2022, in the Riverview Apartments, LLC case, No. 22-10176, asserting a secured claim for $2,448,786.93.

58.     At this time, the relationship between Bruno, who controls the Debtors, and Fannie Mae is severely strained and lacks a foundation of trust for reasons including: (i) the initiation and prosecution of state law foreclosure litigation against certain Debtors by Fannie Mae in April 2021; (ii) Bruno's negotiation of insurance proceeds checks in October and November 2021 without Fannie Mae's knowledge, endorsement, or consent as co-payee, and Bruno's unwillingness to date to account for the expenditure of the entire $800,000 in insurance proceeds; and (iii) Bruno's unwillingness to comply with Fannie Mae's requirement that the Debtors obtain bids from licensed contractors for all renovation projects as a prerequisite to obtaining Fannie Mae's permission to use its cash collateral, rather than using the services of non-Debtor insider DDG, which insists upon charging the Debtors steep mark-ups.

59.     Fannie Mae, through its representative Shaddox, clearly expressed Fannie Mae's vote of no-confidence in Bruno continuing to manage the Debtors and rehabilitate the properties. *See* Hr'g Tr. 116:6–119:3 (June 9, 2022).

*The Sewerage and Water Board of New Orleans*

60.     The Sewerage and Water Board of New Orleans ("SWB") filed the following proofs of claim in the Debtors' cases, asserting general unsecured claims for unpaid prepetition utility bills:  (i) Proof of Claim No. 3, filed on February 28, 2022, in the Westbank Holdings, LLC case, No. 22-10082, asserting a general unsecured claim for $2,209,582.25; (ii) Proof of Claim No. 2, filed on February 25, 2022, in the Cypress Park Apartments II, LLC case, No. 22-10083, asserting a general unsecured claim for $451,695.03; (iii) Proof of Claim No. 3, filed on February 28, 2022, in the Liberty Park Apartments, LLC case, No. 22-10084, asserting a general unsecured claim for $64,475.84; (iv) Proof of Claim No. 2, filed on February 28, 2022, in the Forest Park Apartments, LLC case, No. 22-10085, asserting a general unsecured claim for $107,718.23; and (v) Proof of Claim 8, filed on May 31, 2022, in the Washington Place, LLC case, No. 22-10086, asserting a general unsecured claim for $174,633.62.

61.     On April 18, 2022, this Court entered an Order determining adequate assurance of payment for the Debtors' utility services and restraining utilities from altering, disconnecting, or refusing service to the Debtors.  [ECF Doc. 132].  That Order required the Debtors to pay timely post-petition cash deposits totaling $15,785.00 to Entergy New Orleans and $47,765.00 to SWB as adequate assurance for future performance.  *See id.*

62.     Less than two months later, on June 3, 2022, SWB filed a Written Notice of Default of Utility Order, asserting that Debtors failed (i) to tender adequate assurance per the Court's Order of April 18, 2022 and (ii) to pay timely and in full post-petition utility bills.  [ECF Doc. 294].  The Debtors filed an objection acknowledging that they had not paid the full amount of the adequate assurance deposits or post-petition utility bills.  [ECF Doc. 410].  The Debtors asserted that adequate assurance checks covering approximately two-thirds of the amounts due had been drafted

and mailed to SWB, but inexplicably did not arrive or were not negotiated by SWB. *See id.* The Debtors further contested the amount of post-petition utility bills and cited the dispute as the reason for lack of full payment of those invoices. *See id.*

63.    Fred Tharp, a licensed civil engineer and Class IV operator for water distribution and wastewater collection for the State of Louisiana, currently serves as the Chief of Networks Administration for the SWB. *See* Hr'g Tr. 236:25–442:22 (June 9, 2022). Tharp qualified as an expert in the areas of operations of water and sewer systems including distribution and services and source of leaks. *See id.* The Court found Tharp to be a credible, honest, and no-nonsense witness and affords much weight to his testimony.

64.    On Saturday, March 19, 2022, Bruno sent e-mails with attached photos to counsel for the Debtors, Fannie Mae, and the SWB notifying them of a major water leak at the Oakmont Apartments held by Westbank Holdings, LLC, and alleging that City of New Orleans' contractors had fractured a main plumbing line located on City property. *See* Hr'g Tr. 446:2–455:10 (June 9, 2022); Joint Exs. 1–4. In communications on Monday, March 21, 2022, Bruno remained adamant that the major leak originated on City property. *See* Hr'g Tr. 455:18–457:13 (June 9, 2022); Joint Exs. 5 & 6.

65.    After visiting the Oakmont Apartments property on March 21 and March 22, 2022, Tharp and the Environmental Affairs Department of the SWB found the correct site and source of the leak (the dislocation of a hydrant), which was not close to the site identified by Bruno. *See* Hr'g Tr. 457:16–461:3 (June 9, 2022); Joint Exs. 6, 15; SWB Ex. E.

66.    On March 23, 2022, Tharp met with Bruno and his counsel and informed them that, based on his inspection of the Oakmont Apartments property and SWB's records, the leak was located on the property owned by Westbank Holdings, LLC and not on City property. Bruno was

not satisfied with that information; therefore, Tharp agreed to meet with Bruno and his counsel on the property on March 23, 2022, to shut off particular valves and physically demonstrate the location and cause of the leak.  *See* Hr'g Tr. 461:4–468:4; Joint Ex. 7 & 14.

67.     Once Tharp demonstrated that the leak was located on Westbank Holdings, LLC's property—and, therefore, was Westbank Holdings, LLC's repair responsibility under applicable law—Bruno demanded that Tharp shut off the water completely.  But Tharp refused to do so because

> the facility is not fitted with a backflow preventer, which means that by turning the water off and putting zero pressure on it, there's the ability of contaminants to get into the line.  And if there was another issue, that those contaminants could actually be drawn back in the public water supply . . . .

Hr'g Tr. 467:17–468:15 (June 9, 2022).

68.     Tharp did, however, offer to turn the water off for a short duration when Bruno was prepared to make the repair.  *See* Hr'g Tr. 468:16–17 (June 9, 2022).  Bruno had not arranged for a licensed plumber to be on site that day to make the repair; instead, Bruno responded to Tharp's offer with profanity and threats to turn the water off himself after Tharp left.  *See* Hr'g Tr. 468:18–469:19 (June 9, 2022).

69.     Based upon his inspection of the leak and his knowledge, training, and experience, Tharp concluded that the dislocation of the hydrant occurred on or about March 12 or 13, 2022. *See* Hr'g Tr. 470:3–7 (June 9, 2022).  SWB's records indicate that a tenant of the Oakmont Apartments called SWB's hotline and reported the leak at the property on March 13, 2022.  *See* Hr'g Tr. 470:8–472:4 (June 9, 2022); SWB Ex. J.  In responding to that call, SWB inspectors had already determined and documented that the leak was located on Westbank Holdings, LLC's property and that, therefore, the responsibility for repairing the leak rested with Westbank Holdings, LLC.  *See* Hr'g Tr. 470:8–472:4 (June 9, 2022); SWB Ex. J.

70.     On or about March 30, 2022, forced to use a licensed plumber to repair the leak, Bruno arranged for that plumber to meet Tharp at the site to repair the leak; Tharp turned off the water to allow the plumber to perform the repair and then Tharp turned the water back on.  *See* Hr'g Tr. 472:13–22 (June 9, 2022).  But the "repair" was not a repair; rather, it was a "plug."  *See* Hr'g Tr. 473:3–474:11 (June 9, 2022); SWB Ex. I.  The plumber capped the pipe leading to the dislocated hydrant; thus, that area of the Debtor's property was left without a functioning hydrant. *See* Hr'g Tr. 473:3–474:11 (June 9, 2022); SWB Ex. I.

71.     At the evidentiary hearing, Tharp, on behalf of SWB, clearly expressed SWB's vote of no-confidence in Bruno continuing to manage the Debtors and rehabilitate the properties. Specifically, Tharp noted his concern with Bruno's decision-making with regard to public safety and pointedly observed that "I would almost take my chance with anybody else."  *See* Hr'g Tr. 474:12–476:2 (June 9, 2022).

*The Debtors' Tenants and Community Stakeholders*

72.     Ross James, Program Manager for Unity of Greater New Orleans, testified on behalf of certain tenants and the New Orleans Renters Rights Assembly.  The Court found James to be a reasonable and trustworthy witness and gives considerable weight to his testimony.

73.     The Debtors' contracts with tenants require tenants to pay a portion of the total amount of rent due based upon their income, while the remainder of rent is subsidized through a program developed by the U.S. Department of Housing and Urban Development and monitored and administered by local housing authorities such as Unity of Greater New Orleans. Representatives of local housing authorities inspect rent-subsidized units regularly.  *See* Hr'g 14:23–28:24 (June 10, 2022).  If needed repairs are not made timely, those authorities may stop the subsidies from being paid to landlords. *See id.*  Payment of rent subsidies are sometime delayed

23

due to delays in local housing authorities' grant renewals, for example, at the end of a fiscal year. *See id.* If the subsidy is abated for any reason, however, the tenant remains responsible only for the portion of rent identified in the lease to be paid by the tenant and may not be charged the amount of the rent subsidy or evicted for non-payment of the subsidy. *See* Hr'g 14:23–31:9 (June 10, 2022); Joint Ex. 31; Tenants Ex. A.

74.     Counsel for tenants presented anecdotal evidence that Debtors' management has violated the terms of tenants' lease agreements. On June 17, 2021, a tenant at the Oakmont Apartments held by Westbank Holdings, LLC, received a notice instructing him to pay the amount of the rent subsidy that was overdue under his lease or risk eviction within three days. *See* Hr'g Tr. 33:1–35:21 (June 10, 2022); Joint Ex. 32; Tenants Ex. B.

75.     Because the Debtors have no employees, they were not eligible to apply for and receive forgivable loans in 2020 and 2021 through the Paycheck Protection Program ("PPP") enacted as part of the federal Coronavirus Aid, Relief, and Economic Security Act, as amended and extended. But non-Debtor affiliates DDG and Metrowide, which manage and operate the Debtors' properties, received PPP loans totaling of $17,801 and $478,897, respectively, in or about April 2020 and in or about February 2021, all of which were later forgiven. *See* Hr'g Tr. 183:8–184:25 (June 14, 2022); FM Exs. 748–751.

76.     James, speaking on behalf of Unity of Greater New Orleans, testified that, because of the poor condition of the Debtors' properties, his organization has ceased as of 2019 to recommend any of those properties to its clients for housing options, although clients remain free to choose a housing location for themselves. *See* Hr'g Tr. 40:16–43:13 (June 14, 2022). James clearly expressed his employer's vote of no-confidence in Bruno continuing to manage the Debtors. *See id.*

## CONCLUSIONS OF LAW

### A.      Standards Governing the Appointment of a Chapter 11 Trustee

The Bankruptcy Code provides that, any time prior to confirmation, the Court **shall** order

the appointment of a chapter 11 trustee upon request of a party in interest

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).   "The appointment of a Trustee in a Chapter 11 case is an extraordinary

remedy which should not be granted lightly, as it may impose a substantial financial burden on a

hard-pressed debtor seeking relief under the Bankruptcy Code."  *In re Sharon Steel Corp.*, 86 B.R.

455, 457 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217 (3d Cir. 1989) (citations omitted); *see also*

*In re Patman Drilling Int'l, Inc.*, No. 07-34622, 2008 WL 724086, at *6 (Bankr. N.D. Tex. 2008).

"The movant must prove the need for a trustee by clear and convincing evidence." *In re Euro-Am.*

*Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) (citing *In re Sharon Steel Corp.*, 871

F.2d at 1225); *see also In re Patman Drilling Int'l, Inc.*, 2008 WL 724086, at *6.  "Courts have

discretionary authority to determine if cause exists."  *In re TAAF, LLC*, No. 10-00171, 2010 WL

582436, at *1 (Bankr. E.D.N.C. Feb. 12, 2010) (citing *Comm. of Dalkon Shield Claimants v. A.H.*

*Robins Co.*, 828 F.2d 239, 242 (4th Cir. 1987)).

### 1.      Definition of "cause" under § 1104(a)(1)

Section 1104(a)(1) provides several examples of "cause" in considering whether the

appointment of a trustee is required, including "dishonesty . . . by current management, either

before or after the commencement of the case."  11 U.S.C. § 1104(a)(1).  Thus, a court may

consider both the pre- and post-petition misconduct of the current management when making the determination that "cause" exists for the appointment of a chapter 11 trustee. *See In re 1031 Tax Grp., LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007) (citation omitted).

And "[a]lthough there is no Fifth Circuit case law that defines 'dishonesty' for purposes of § 1104, courts across the country recognize that 'dishonesty' under § 1104 may encompass a variety of actions" and "[t]he definitions used by these courts track with Merriam–Webster's definition of 'dishonesty' as 'lack of honesty or integrity: disposition to defraud or deceive.'" *In re Amerejuve, Inc.*, No. 14-35482, 2015 WL 2226344, at *9 (Bankr. S.D. Tex. Apr. 29, 2015) (citations omitted). Further, a finding that the principals or managers of a debtor possess irremediable conflicts of interest can also serve as "cause" to appoint a trustee under § 1104(a)(1). *See In re Cajun Elec. Power Co-op, Inc*., 69 F.3d 746, 749 (5th Cir. 1995), *withdrawn in part on rehr'g*, 74 F.3d 599 (5th Cir. 1996) (withdrawing section IV and adopting reasoning of dissent in prior opinion). Indeed, in determining whether cause exists, courts have considered the

> materiality of misconduct, evenhandedness or lack thereof in dealings with insiders and affiliated entities in relation to other creditors, the existence of pre-petition voidable preferences or fraudulent conveyances, unwillingness or inability of the debtor-in-possession to pursue estate causes of action, conflicts of interest on the part of the debtor-in-possession interfering with its ability to fulfill fiduciary duties, and self-dealing or squandering of estate assets.

*In re Daily*, No. 309-05337, 2009 WL 3415204, at *3 (Bankr. M.D. Tenn. Oct. 19, 2009) (citing *In re Nartron Corp*., 330 B.R. 573, 592 (Bankr. W.D. Mich. 2005)). "Noncompliance with court orders is conduct that similarly constitutes cause within the meaning of section 1104(a)(1)." *In re Sillerman*, 605 B.R. 631, 645 (Bankr. S.D.N.Y. 2019) (citations omitted).

2. *Interests of creditors and the estate under § 1104(a)(2)*

Under § 1104(a)(2), upon request of a party in interest, the Court must order the appointment of a trustee if such an appointment "is in the interests of creditors, any equity security

holders, and other interests of the estate."  Further, the Court's decision to appoint a trustee under

subsection (a)(2) must be made "without regard to the number of holders of securities of the debtor

or the amount of assets or liabilities of the debtor."  "It is not necessary to find fault on the part of

the debtor-in-possession before appointing a chapter 11 trustee in the interests of creditors, any

equity security holders, and other interests of the estate pursuant to § 1104(a)(2)."  *In re Ford Steel,*

*LLC*, 629 B.R. 871, 889–90 (Bankr. S.D. Tex. 2021) (internal quotations and citation omitted).

"Courts have found that a history of transactions with companies affiliated with the debtor

is sufficient cause to appoint a trustee in the best interest of creditors."  *In re Golden Park Estates,*

*LLC*, No. 14-12253, 2015 WL 3643479, at *6 (Bankr. D.N.M. June 11, 2015) (citing cases).  That

is because "the debtor's ability to fulfill its duty of care to protect the assets, its duty of loyalty,

and its duty of impartiality" is at the heart of a § 1104(a)(2) analysis.  *In re Celeritas Techs., LLC*,

446 B.R. 514, 520 (Bankr. D. Kan. 2011) (citing *Commodity Futures Trading Comm'n v.*

*Weintraub*, 471 U.S. 343, 355 (1985)).  Other factors to be considered under a § 1104(a)(2) inquiry

include:

> (i) the trustworthiness of the debtor; (ii) the debtor-in-possession's past and present
> performance and prospects for the debtor's rehabilitation; (iii) the confidence—or
> lack thereof—of the business community and of creditors in present management;
> and (iv) the benefits derived by the appointment of a trustee; balanced against the
> cost of the appointment.

*In re Ford Steel, LLC*, 629 B.R. at 890 (citation omitted).  Ultimately, however, the standard is

flexible and the Court should consider "the practical realities, necessities of the case, and the

totality of the circumstances in determining whether to appoint a trustee."  *Id*. (citations omitted).

### B.  Cause Exists Under §§ 1104(a)(1) and 1104(a)(2) To Appoint a Chapter 11 Trustee

Bruno surreptitiously caused a total of $800,000 in insurance proceeds that were to be used

to repair hurricane damage to properties held by the Debtors to vanish in the wind without one

receipt, cancelled check, or other primary-source support to show that the proceeds were spent on repairs to the properties.  Although Bruno claimed that the insurance proceeds were used to reimburse DDG for the post-hurricane mitigation and repair work performed on the Debtors' properties, the evidence shows that minimal repairs have been made to the Debtors' properties since Hurricane Ida ravaged them.  The Court concludes that Bruno, at best, has allowed estate assets to be squandered and, at worst, has been dishonest and engaged in self-dealing.

The Debtors' SOFAs identify millions in prepetition voidable preferences and/or potentially fraudulent conveyances to insiders and non-Debtor affiliates.  Not only do the Debtors hold claims adverse to their non-Debtor affiliates, a strong probability also exists that Bruno himself holds claims adverse to the interests of both the Debtors and other non-Debtor affiliates. The volume of intercompany and insider transactions forces the Court to presume that Bruno will be unable to conduct the impartial investigations and make the decisions required to evaluate and pursue intercompany claims on behalf of the Debtors.  Bruno himself confirmed that he would not investigate and pursue avoidance actions against insiders and non-Debtor affiliates, and was uninformed when asked who would, stating that "we're going to first assign it once the CRO is onboarded and then he'll make the determination or the Court or the attorneys on both sides to [*sic*] pick a third party if need be and have them review."  *See* Hr'g Tr. 54:10–20 (June 14, 2022). But the Debtors' employment agreement with the CRO does not task him with identifying and pursuing avoidance actions and bringing assets back into the estates for the benefit of creditors and, further, that responsibility does not lie with either the Court or the Debtors' attorneys.

Bruno provided hours of testimony, both as Fannie Mae's adverse witness and later on behalf of the Debtors.  Bruno took little responsibility for the operations and management of the Debtors to date, often blaming the few staff employed by his non-Debtor affiliates and even his

state court and bankruptcy counsel for, as an example, the absence of any explanation or evidence concerning the distribution of $800,000 in insurance proceeds belonging to the Debtors.  *See* Hr'g Tr. 271:6–284:23 (June 9, 2022).  The Court found Bruno's testimony on the whole to be evasive, unclear, and devoid of candor, and thus gives little to no weight to his testimony.  Based on the documentary evidence and testimony presented to the Court over four days, the Court is left with a strong impression that Bruno is overwhelmed, but operates solely in his own interest, is inclined to flout or skirt laws, rules, regulations, and ethics when it suits him, and, at times, prefers the use of intimidation and strong-arm tactics against those over whom he feels he has leverage.  *See, e.g.*, Hr'g Tr. 17:22–61:9 (June 9, 2022) (testimony of tenant George Erdei); Hr'g Tr. 436:25–476:2 (June 9, 2022) (testimony of Fred Tharp, SWB); Hr'g Tr. 15:10–45:23 (June 13, 2022) (testimony of Rochee Jackson, former employee of Bruno's non-Debtor management company).

The practical realities of this case are these:  (i) the Debtors' assets are in a state of abject decrepitude, unable to be renovated and become income-producing again without a massive investment of resources; (ii) the sole member-manager of the Debtors has demonstrated neither honesty and trustworthiness nor a willingness to operate the Debtors for the benefit of his creditors rather than himself; and (iii) the creditor body—which includes scores of the most vulnerable citizens of this community as well as a lender and quasi-public entities who are owed millions— lacks confidence in Bruno to manage the renovations and operations of the Debtors with integrity. It is true that the Debtors have retained valuable teammates in the CRO, Hernandez, and Trinity, but in the end, those professionals are given no real autonomy and must report to Bruno, who currently retains complete authority over the operation and management of the Debtors.

Based on the evidence before it, the Court can only conclude that the continuation of current management will result in serious conflicts of interest and further financial distress to the

Debtors.  The Court further concludes that it would be more economical and beneficial to creditors and the estates of these Debtors to have current management replaced by an independent chapter 11 trustee who will manage the Debtors' properties in good faith and will pursue recoupment of monies due and owing the Debtors from all sources.  The Court finds that the interests of creditors and the estates would be better served by the appointment of an experienced and independent chapter 11 trustee, whose sole motivation is to return each Debtor to a going concern.  That is no easy ask.  The Debtors' problems are serious and multilayered, and the need for the housing that the Debtors provide this community is great.  But the challenge is not insurmountable.  To be successful, however, the trustee will be required to work hand-in-hand with Fannie Mae, community stakeholders, and the Debtors' retained professionals to renovate the Debtors' properties and, at the same time, develop a plan of reorganization that will treat all classes of creditors fairly and equitably and chart a path for the Debtors going forward.  Bruno is not the manager that can do that.

## CONCLUSION

Thus, given the evidence and totality of the circumstances in these Debtors' cases, the Court finds cause to appoint a trustee and must do so in the best interest of creditors and the estate.

**SO ORDERED.**

An Order for appointment of a chapter 11 trustee pursuant to § 1104 of the Bankruptcy Code will be entered separately into the record.

New Orleans, Louisiana, this 1st day of August, 2022.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE