## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| | § | |
| IN RE: | § | CASE NO: 22-10082 |
| | § | |
| WESTBANK HOLDINGS, LLC, *et al.*[1] | § | CHAPTER 11 |
| | § | |
| DEBTORS. | § | SECTION A |
| | § | |

### MEMORANDUM OPINION AND ORDER

On Tuesday, April 11, 2023, the Court held a one-day evidentiary hearing to consider the Chapter 11 Bankruptcy plan, as amended, [ECF Docs. 648-1, 722, 747 & 910], filed by the Federal National Mortgage Association ("Fannie Mae"), and the Objections filed by (i) the Office of the United States Trustee ("UST"), [ECF Doc. 877], and (ii) Joshua Bruno, [ECF Doc. 880]. Following the evidentiary hearing, Fannie Mae filed the *Amended Creditor's Plan of Reorganization for the Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code* conforming to concessions made at trial (the "Plan"). [ECF Doc. 916].

The Court makes the following findings of fact and conclusions of law pursuant to Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure.[2] For the following reasons, the Court CONFIRMS Fannie Mae's Plan.

---

[1] An *Order* directing joint administration of the chapter 11 bankruptcy case of Westbank Holdings, LLC, as lead case, with the chapter 11 bankruptcy case of affiliated debtors, Cypress Park Apartments II, LLC, Case No. 2210083, Forest Park Apartments, LLC, Case No. 22-10085, Liberty Park Apartments, LLC, Case No. 22-10084, and Washington Place, LLC, Case No. 22-10086, was entered on February 4, 2022. [ECF Doc. 17]. An *Order* directing the joint administration of affiliated debtor Riverview Apartments, LLC, 22-10176, was entered on March 14, 2022. [Case No. 22-10176, ECF Doc. 19]. Unless otherwise noted, all record citations refer to documents filed in the lead case.

[2] To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334.  The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(L).  The venue of the Debtors' chapter 11 cases is proper under 28 U.S.C. §§ 1408 and 1409(a).

## FINDINGS OF FACT

### A. The Debtors' Prepetition Businesses, Relationship with Fannie Mae, and Bankruptcy Filing

The events leading to the filing of the Debtors' bankruptcy cases in early 2022 is undisputed and well documented in the record of these jointly administered cases:

Joshua Bruno is the sole managing member of each of the six affiliated single-asset-real-estate Debtors:  Westbank Holdings, LLC, Cypress Park Apartments II, LLC, Liberty Park Apartments, LLC, Forest Park Apartments, LLC, Washington Place, LLC, and Riverview Apartments, LLC.  Each of the six Debtors is a holding company for multifamily apartment buildings (the "Properties") and, prepetition, provided subsidized-rental housing for low-income families in the greater New Orleans area.  The Debtors have no employees; rather, Bruno utilized other of his wholly owned non-debtor affiliates to manage the Debtors' businesses:  Metro-Wide Apartments, LLC and Metro-Wide Apartments II, LLC oversaw property management and leasing; Downtown Development Group, LLC performed and managed all repairs and capital improvements for the Debtors and also served as the exclusive contractor and insurance claims consultant for the Debtors; WBH Servicing, LLC employed personnel who worked at apartments held by Westbank Holdings, LLC; and MW Servicing, LLC employed personnel who worked at apartments held by the other five Debtors.

In December 2014, Bruno, on behalf of five of the Debtors, borrowed a total principal amount of $6,985,000 from Greystone Servicing Corporation, Inc. ("Greystone Servicing"), an entity that provides acquisition and refinancing loans for multifamily housing projects.  In March 2018, Bruno, on behalf of Westbank Holdings, LLC, borrowed the principal amount of $22,150,000 from Greystone Servicing.  To secure the repayment of $29,135,000 in 120-month, fixed rate, non-recourse notes, Bruno pledged each Debtor's immovable property and improvements, leases, rents, and insurance policies and proceeds.  Greystone assigned and endorsed the notes and mortgages to Fannie Mae and has continued to service the debt on behalf of Fannie Mae.  *See* No. 22-10082, Proof of Claim 11 (Exs. 1–5); No. 22-10083, Proof of Claim 9, (Exs. 1-5); No. 22-10084, Proof of Claim 7 (Exs. 1–5); No. 22-10085, Proof of Claim 6 (Exs. 1–5); No. 22-10086, Proof of Claim 7 (Exs. 1–5); No. 22-10176, Proof of Claim 8 (Exs. 1–5).

Each of the Debtors' apartment buildings sustained damage caused by Hurricane Zeta, a Category 3 hurricane which made landfall in Louisiana on October 28, 2020, and Hurricane Ida, a Category 4 hurricane which made landfall in Louisiana on August 29, 2021.  In March 2020, state and local governments issued stay-at-home orders in response to the COVID-19 public health emergency.  The businesses of the Debtors suffered as a consequence of the pandemic, as many tenants could not pay rent during those months and local authorities imposed a moratorium on evictions.  Although Bruno entered into a forbearance agreement with Fannie Mae in the second quarter of 2020, out-of-court workout negotiations did not bear fruit and Fannie Mae initiated foreclosure proceedings in April 2021.  Bruno authorized five of the Debtors to file petitions for chapter 11 bankruptcy relief on January 27, 2022, and authorized the sixth Debtor, Riverview Apartments, LLC, to file on February 23, 2022.

### B.  Relevant Events During the Debtors' Jointly Administered Bankruptcy Cases

#### 1.  Cash Collateral Orders

This Court issued several consent Orders allowing the Debtors the use of Fannie Mae's cash collateral.  [ECF Docs. 19, 37 & 92].  As adequate protection for use of cash collateral, the Debtors granted Fannie Mae a claim in the amount of any post-petition diminution of the value of Fannie Mae's security interest in the assets of the Debtors and to secure that claim, the Debtors granted Fannie Mae replacement security interests in and liens upon all post-petition personal property, accounts, and cash of the Debtors to the extent Fannie Mae possessed prepetition perfected security interests in those assets.  The Orders expressly carved out from Fannie Mae's security interests any causes of action arising from §§ 510, 544, and 546–551 of the Bankruptcy Code.  The Orders entered by the Court also required the Debtors to adhere to a budget approved by the Court for expenditures and to obtain Fannie Mae's consent for emergency expenditures prior to moving the Court for final approval of those expenditures.

Serious events occurred on the Debtors' Properties that required expensive, emergency expenditures of cash collateral, including sewer and plumbing breaks as well as fires which destroyed parts of already-damaged buildings.  [ECF Docs. 202, 380, 386 & 500].  The Court also entered consent Orders permitting the use of insurance proceeds and recoverable depreciation (encumbered by liens held by Fannie Mae) to begin repairs on some of the Debtors' buildings damaged by Hurricane Ida.  [ECF Docs. 556 & 606].

#### 2.  Proofs of Claim Filed

Fannie Mae filed proofs of claim against the Debtors' estates asserting prepetition secured claims in the aggregate amount of approximately $42.9 million.  *See* No. 22-10082, Proof of Claim 11; No. 22-10083, Proof of Claim 9; No. 22-10084, Proof of Claim 7; No. 22-10085, Proof of

Claim 6; No. 22-10086, Proof of Claim 7; No. 22-10176, Proof of Claim 8.[3]   The U.S. Small Business Administration ("SBA") also filed proofs of claim asserting prepetition secured claims against the Debtors' estates in the aggregate amount of approximately $368,000.  *See* No. 22-10082, Proof of Claim No. 1; No. 22-10083, Proof of Claim No. 1; No. 22-10084, Proof of Claim No. 2; No. 22-10086, Proof of Claim No. 2; No. 22-10176, Proof of Claim No. 3.  The City of New Orleans likewise asserted prepetition secured claims against the Debtors' estates for code violations in the total amount of $7,650.  *See* No. 22-10082, Proof of Claim Nos. 49 & 50.  Federal, state, and municipal taxing authorities also filed priority unsecured claims against the Debtors' estates in the total aggregate amount of approximately $145,000.  *See* No. 22-10082, Proof of Claim Nos. 46–48; No. 22-10083, Proof of Claim Nos. 3 & 5; No. 22-10084, Proof of Claim Nos. 4 & 5; No. 22-10085, Proof of Claim Nos. 3 & 4; No. 22-10086, Proof of Claim Nos. 4 & 5; No. 22-10176, Proof of Claim Nos. 1 & 6.

Insiders of the Debtors and non-debtor affiliates filed proofs of claim against the Debtors' estates asserting prepetition general unsecured claims in the aggregate amount of approximately $3.5 million.  *See* No. 22-10082, Proof of Claim Nos. 22–26; No. 22-10083, Proof of Claim Nos. 12–14; No. 22-10084, Proof of Claim Nos. 8 & 9; No. 22-10085, Proof of Claim Nos. 7 & 8; No. 22-10086, Proof of Claim Nos. 9 & 10; No. 22-10176, Proof of Claim Nos. 9–12.

The Sewerage and Water Board of New Orleans ("SWB") filed proofs of claim against the Debtors' estates asserting prepetition general unsecured claims in the aggregate amount of

---

[3]      The total amount of Fannie Mae filed identical proofs of claim asserting a secured claim of $2,306,773.10 in each of the claims registers for Forest Park Apartments, LLC, Liberty Park Apartments, LLC, and Washington Place, LLC.  Those three Debtors are co-obligors on the same promissory note.  *See* No. 22-10084, Proof of Claim 7 (Exs. 1–3); No. 22-10085, Proof of Claim 6 (Exs. 1–3); No. 22-10086, Proof of Claim 7 (Exs. 1–3).  Although each of those Debtors is solidarily liable for the debt, Fannie Mae can only collect amounts owed under the loan documents one time.  Thus, more accurately, Fannie Mae asserts a total claim of approximately $38.3 million against the estates.

approximately $3 million.  *See* No. 22-10082, Proof of Claim No. 3; No. 22-10083, Proof of Claim No. 2; No. 22-10084, Proof of Claim No. 3; No. 22-10085, Proof of Claim No. 2; No. 22-10086, Proof of Claim No. 8.  Entergy New Orleans, LLC also asserted prepetition general unsecured claims against the Debtors' estates in the aggregate amount of approximately $186,000.  *See* No. 22-10082, Proof of Claim No. 8; No. 22-10083, Proof of Claim No. 7; No. 22-10084, Proof of Claim No. 6; No. 22-10085, Proof of Claim No. 5; No. 22-10086, Proof of Claim No. 6; No. 22-10176, Proof of Claim No. 7.

In addition to various other creditors filing general unsecured claims, numerous current and former tenants filed proofs of claim asserting priority unsecured claims for rental deposits as well as general unsecured claims including property damage, breach of contract, and personal injury.[4]

To date, no objections to any proofs of claim have been filed.

### 3. *Appointment of a Chapter 11 Trustee*

Early in the case, on March 28, 2022, Fannie Mae filed a motion to appoint a chapter 11 trustee to oversee and operate the businesses of the Debtors pursuant to 11 U.S.C. §§ 1104(a)(1) and (a)(2) for cause and in the best interests of creditors and the Debtors' estates.  [ECF Doc. 86]. The SWB, a coalition of current and former tenants of the Debtors, and the Federal Housing Finance Agency joined Fannie Mae's motion to appoint a trustee.  [ECF Docs. 93, 135 & 138] After a four-day evidentiary hearing in June 2022, this Court issued a memorandum opinion and order on August 1, 2022, granting the motion and instructed the UST to appoint a trustee.  [ECF

---

[4]     The prepetition and post-petition condition of the Properties has been documented in this Court's August 1, 2022 *Memorandum Opinion and Order* directing the appointment of a chapter 11 trustee to oversee and administer the Debtors' estates pursuant to 11 U.S.C. § 1104.  [ECF Doc. 444].

Doc. 444 & 445].   The UST appointed Dwayne Murray to serve as the chapter 11 trustee (the "Trustee").

Following the appointment of the Trustee, Bruno filed a disclosure statement and plans of reorganization on September 26, 2022, proposing a path whereby he would retain control of and operate each Debtor (the "Plans"). [ECF Docs. 537–543].[5]   While Bruno moved forward with his proposed plan process, on November 25, 2022, the Trustee initiated a process for the Properties to be sold at auction by filing a *Motion for Entry of Orders (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; (III) Establishing Carve Out; and (IV) Granting Related Relief the Court* (the "Bid Procedures Motion"), [ECF Doc. 570].   The Court approved the Bid Procedures Motion, and set dates for the auction and all pre-auction deadlines (the "Bid Procedures Order").   [ECF Doc. 637].   Importantly, the Bid Procedures Order established January 30, 2023, as the deadline to file objections to the secured claims asserted by Fannie Mae against each Debtor and its right to credit bid at the auction; otherwise, "the existence, validity and perfection of the security interests and liens of Fannie Mae as first priority liens on the assets

---

[5]      The Court set a hearing to consider the adequacy of the disclosure statement to occur on November 7, 2022.  [ECF Doc. 554].  After receiving objections to the disclosure statement, [ECF Docs. 573, 576, 577 & 579], Bruno amended his disclosure statement on November 4, 2023, [ECF Doc. 589].  The Court held the disclosure statement hearing and continued that hearing to November 22, 2022.  [ECF Doc. 590].  Based on the discussion at the disclosure statement hearing, Bruno again amended his disclosure statement as well as the six Plans on November 14, 2022.  [ECF Docs. 594–602].  The Court held the hearing on the adequacy of the disclosure statement on November 22, 2022, and conditionally approved the disclosure statements with amendments.  Bruno amended the disclosure statement and his six proposed Plans of reorganization again on November 28, 2022.  [ECF Docs. 517–624 & 629].  The Court set the hearing to consider confirmation of those proposed Plans to occur on March 2–3, 2023.  [ECF Doc. 629].  At the request of the parties, the Court continued the confirmation hearing on Bruno's proposed Plans to March 21 & 24, 2023.  [ECF Doc. 703].  On March 7, 2023, Bruno filed a motion to continue the confirmation hearing and, after a status conference, the Court granted that request, resetting the confirmation hearing to April 5–6, 2023.  [ECF Docs. 768 & 784].  On March 22, 2023, Bruno again amended his six proposed Plans.  [ECF Docs. 814–824].  The Court found that those amendments contained material adverse modifications and required Bruno to re-notice the proposed amended Plans, but reduced the time in which to hold a hearing to consider confirmation of those plans, setting the confirmation hearing to occur on April 27–28, 2023.  [ECF Doc. 834].

subject to said liens (subject to any carve out and ad valorem taxes) shall be deemed valid and unavoidable and Fannie Mae shall be entitled to credit bid if it so chooses." *Id*. Upon the request of the parties, the Court extended the deadline to object to Fannie Mae's claims to February 6, 2023. [ECF Doc. 704]. Bruno filed a motion objecting to Fannie Mae's right to credit bid at the auction, but did not challenge the amount, extent, validity or priority of Fannie Mae's liens. [ECF Doc. 719].[6] Thus, the Court finds that Fannie Mae's proofs of claim filed against each of the Debtors' estates are allowed pursuant to 11 U.S.C. § 502(a). Currently, the auction is scheduled to occur on May 1, 2023. [ECF Doc. 788].

In January 2023, Fannie Mae filed its own disclosure statement and plan of liquidation. [ECF Docs. 648, 722, 747 & 910]. The parties have conducted extensive discovery related to the plans proposed by both Bruno and Fannie Mae.

### C. Fannie Mae's Plan and the Tabulation of Ballots

Fannie Mae holds senior perfected liens on substantially all of the Debtors' assets. It is undisputed that Fannie Mae's debt is significantly undersecured. Fannie Mae has proposed a liquidating Plan that dovetails with the Trustee's auction process. The Plan calls for the orderly liquidation of the Debtors' assets and establishes a Liquidating Trust in which all of the Debtors' assets shall vest, including auction proceeds, insurance claims and proceeds, and litigation claims.[7]

---

[6]    Bruno asserted that "cause" existed to deny Fannie Mae its right to credit-bid under 11 U.S.C. § 363(k) because "it intends to use its credit bid to block any purchaser associated with Bruno from bidding on the Debtors' properties" and because of "Fannie Mae's bad faith conduct," namely, initiating prepetition foreclosure actions. [ECF Doc. 719, ¶¶ 1, 3]. Bruno, however, recognized the extent, validity, and priority of Fannie Mae's claims as well as the amount, stating in the motion that "Fannie Mae may bid at least $25 million without paying any cash" and "the Fannie Mae claim amount may range from approximately $25 million to in excess of $33 million, in the aggregate." [ECF Doc. 719, ¶¶ 4 & 19]. After notice and hearing, the Court denied Bruno's motion. [ECF Doc. 783].

[7]    Fannie Mae, through Greystone as its loan servicer, force-placed insurance on the Debtors' Properties post-petition and asserts that any proceeds paid on claims covered by those policies are not property of the estate because only Fannie Mae itself has the right to receive and keep those proceeds. *See* Plan, § 5.2. On April 13, 2023, Fannie Mae filed a motion asking this Court to confirm that the automatic

*See* Plan, §§ 5.1– 6.20.  The Plan contemplates that the Liquidating Trust shall be administered by a Liquidating Trustee who will have authority to liquidate and make distributions to holders of Allowed Claims in accordance with a Liquidating Trust Agreement.   *See id*.  The Liquidating Trustee is required to consult with a Liquidating Trust Advisory Board, comprised of three members, two of which will be appointed by Fannie Mae and a third which will be appointed by the SWB.  *See* Plan, § 6.2.1.  Any compromise or settlement of any claim or action by the Liquidating Trustee exceeding $200,000 must be approved by the Liquidating Trust Advisory Board.  *See id*.

Under Fannie Mae's Plan, allowed administrative expense claims, including professionals employed by the Trustee, will be paid in full on the Effective Date of the Plan or within five days of entry of an Order allowing such claim.  *See* Plan, §§ 2.1 & 2.2.[8]  Section 507(a)(7) priority security deposit claims shall also be paid in full on the Effective Date.  *See* Plan, § 2.4.  Section 507(a)(8) tax claims shall be paid in full within thirty days of the Effective Date.  *See* Plan, § 2.3.

Fannie Mae's Plan classifies its own allowed secured claims in Class 1 and the Plan gives Fannie Mae the "Real Property Net Proceeds" at the closing of the auction.  *See* Plan, § 3.1.  "Real Property Net Proceeds" is defined in the Plan as

> the Cash derived at the Closing Date from the Asset Sales after payment of the broker commission, all other customary expenses of sale, other amounts authorized to be disbursed from the sale proceeds, including the Carve Out, in accordance with the Plan and such additional funds (not otherwise available, such as insurance proceeds held by the Chapter 11 Trustee) that are necessary to satisfy the obligations of the Liquidating Trust.

---

stay imposed by 11 U.S.C. § 362(a) is not in effect as to those policies or proceeds. [ECF Doc. 936].  That matter is set for hearing on May 17, 2023.  [ECF Doc. 937].

[8]       The Plan requires notices of administrative expense claims to be filed within thirty days after the Effective Date.  *See* Plan, § 2.1.2.

Plan, art. I.[9]

Fannie Mae's Plan classifies general unsecured creditors equity and identifies certain classes of creditors which will receive a distribution in full or partial satisfaction of those claims on or within thirty days of the Effective Date.  *See* Plan, art. III.  Those classes of unsecured

---

[9]     The "Carve Out" is defined in the Plan as "the portion of the proceeds from the Asset Sales that is set aside and designated for payment of certain expenses and liabilities incurred in connection with preserving, operating and disposing of the Debtors' Real Property as set forth in paragraph 37 of the *Order Approving Bidding and Auction Procedures*."  Plan, art. I.  Paragraph 37 of the Bid Procedures Order in pertinent part requires:

> Out of the sales proceeds of the Assets and from any other assets of the estates subject to any pre-petition or post-petition lien or post-petition administrative and/or superpriority Claims and any pre-petition or post-petition liens securing same of the Consultation Party [Fannie Mae], a carve out will be provided to the Trustee (and any successor Chapter 11 trustee or chapter 7 trustee in the event of conversion of any Case, and which carve out will survive and shall not be modified, impaired or discharged by entry of a confirmation order confirming any plan or reorganization in the Cases, or converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code, or dismissing any of the Cases) pursuant to applicable law, including but not limited to 11 U.S.C. § 506(c), for the payment in full, in preference and priority to the claims and liens of the Consultation Party, of the following expenses and liabilities set forth in subparagraphs (1)–(8) below (or a reserve established for the payment of such expenses and liabilities) incurred during the cases in connection with preserving, operating and disposing of the Assets (such expenses and liabilities or the reserves therefor, collectively, the "Carve Out"):
>
> > (1)  The Allowed professional fees and expenses of Fishman Haygood, LLP's and other Professionals retained by the Trustee;
> >
> > (2)  Broker's allowed fees and expenses;
> >
> > (3)  Allowed fees and expenses for any on-line marketing and advertising platform;
> >
> > (4)  Costs to maintain and operate the Assets until the Closing Date . . .;
> >
> > (5)  Wind down costs;
> >
> > (6)  Closing costs, Real Estate Taxes, priority claims, any break-up fees, expenses, reimbursements, and other similar costs;
> >
> > (7)  Any commission and expenses to which the Trustee may be entitled pursuant to 11 U.S.C. §§ 326, 330 and 331;
> >
> > (8)  The quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court. . . .

[ECF Doc. 637].

creditors and equity that will not receive such immediate distribution will receive *pro rata* distributions from the Liquidating Trust in order of priority.  *See id.*

| Subclass/Creditor | Distribution On or Within 30 Days of the Effective Date | *Pro Rata* Distribution from Liquidating Trust |
|---|---|---|
| 2A:  Allowed General Unsecured Creditors[10] | Payment in full on the Effective Date | N/A |
| 2B:  Current and Former Tenants of Debtors | One distribution of $1250 on the Effective Date in full satisfaction of any and all claims, unless tenant timely opts out of this proposed treatment | If tenant timely opts out of proposed treatment, tenant's claims against estates are preserved and subject to claims allowance process.  He/she will share *pro rata* in distributions from Liquidating Trust in full satisfaction of claim[11] |
| 2C:  Sewerage & Water Board | Distribution of $357,000 within 30 days of Effective Date in partial compromise and satisfaction of its $3,008,104 claim | Claim will be subject to claims allowance process and SWB will share *pro rata* in distributions from Liquidating Trust in full satisfaction of claim |
| 2D:  Small Business Administration,[12] Insider & Intercompany Claims | None. | Claim will be subject to claims allowance process and claimant will share *pro rata* in distributions from Liquidating Trust in full satisfaction of claim |
| 2E:  Fannie Mae's Deficiency Claim | None. | Claim will be subject to claims allowance process and Fannie Mae will share *pro rata* in distributions from Liquidating Trust in full satisfaction of claim; however, Fannie Mae's deficiency claim is reduced by the amounts paid to general |

---

[10]      The City of New Orleans filed proofs of claim asserting secured claims against Westbank Holdings, LLC for code violations.  *See* No. 22-10082, Proof of Claim Nos. 49 & 50.  Fannie Mae asserts that the claim is junior to Fannie Mae's perfected liens as Fannie Mae's debt is undersecured, and that, therefore, the City of New Orleans' claims are wholly unsecured.  *See* Plan, § 3.1.

[11]      One tenant opted-out of the proposed treatment of her claim in the Plan; therefore, any distribution that the tenant will receive will be shared *pro rata* with the Sewerage and Water Board of New Orleans, Small Business Administration, insider and non-debtor affiliates, and Fannie Mae from the Liquidating Trust.

[12]      The SBA filed proofs of claim asserting secured claims against five of the Debtors based on promissory notes and security agreements dates between 2020 and 2021.  *See* No. 22-10082, Proof of Claim No. 1; No. 22-10083, Proof of Claim No. 1; No. 22-10084, Proof of Claim No. 2; No. 22-10086, Proof of Claim No. 2; No. 22-10176, Proof of Claim No. 3.  Fannie Mae asserts that those liens are junior to its perfected liens as Fannie Mae's debt is undersecured, and that, therefore, the SBA's claims are wholly unsecured.  *See* Plan, § 3.1.

| | | |
|---|---|---|
| | | unsecured claimants on or within thirty days of the Effective Date |
| 3:  Reserved | | |
| 4:  Member Interests | None. | All existing Member Interests are cancelled on the Effective Date.  Claimant will receive a distribution from the Liquidating Trust in full satisfaction of claim after payment in full of all allowed claims in Class 2 |

The tabulation of ballots submitted by Fannie Mae indicates that all classes eligible to vote to accept or reject the Plan voted to accept the Plan, but for the class containing insider and intercompany claims, that is, Bruno's claims and those of his non-debtor affiliated companies. [ECF Doc. 891].[13]

Under the Plan, Fannie Mae receives no benefit from the exculpation provision and the Plan contains no third-party release provisions.  *See* Plan, §§ 11.2 & 11.3.  The Plan contains the following "Gatekeeping Provision":

> Except as otherwise provided in this Plan and **to the extent permitted by law**, no person may commence or pursue a claim or cause of action of any kind against the Debtors, the Chapter 11 Trustee, the Liquidating Trust, the Proponent, or their Professionals (the "***Protected Parties***") that arose or arises from or is related to the Chapter 11 Cases, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the liquidation of the businesses of the Debtors, the administration of the Liquidating Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) fist determining, after notice and hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal

---

[13]      Fannie Mae initially classified insider and intercompany claims separately in Class 3 as subordinated to all of the Class 2 general unsecured claims.  One of the objections to the Plan lodged by Bruno concerned Fannie Mae's attempt to subordinate those claims unilaterally without providing notice and due process to those claimants and in violation of 11 U.S.C. § 1122.  At the confirmation hearing, Fannie Mae conceded the issue and reclassified insider and intercompany general unsecured claims on par with other general unsecured claims.  *Compare* ECF Doc. 747, § 3.3, *with* ECF Doc. 916, § 3.2  At this time, the insider and intercompany claims are classified with the claims of the SBA, which did not cast a ballot to accept or reject the Plan.  [ECF Doc. 891].  With the ballots cast by Bruno and the non-debtor affiliates rejecting the Plan, Subclass 2D remains an impaired rejecting class.

misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such person to bring such claim or cause of action against any such Protected Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in the Plan or Confirmation Order, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

Plan, § 11.5 (emphasis added).

### D.  The Confirmation Hearing

At the Confirmation the Hearing, the Court considered the testimony and documentary evidence as listed in this Court's Order.  [ECF Doc. 914].

#### 1.  *Testimony of Beau Box, Commercial Real Estate Broker*

Fannie Mae first elicited testimony from Beau Box, the President of Beau Box Commercial Real Estate, LLC, the firm employed by the Trustee to market and auction the Properties.  [ECF Doc. 639].  This Court recognized Box's competency and credentials as a commercial real estate broker by virtue of its Order approving the application to retain Box and his firm filed by the Trustee.  *See id*.  Box, a credible witness, updated the Court on the progress his firm has made in marketing the Properties and vetting potential bidders.  *See* Hr'g Rec'ing 10:06–10:13 a.m. (Apr. 11, 2023).  Although the deadline for submitting qualified bids to participate in the auction is April 20, 2023, Box testified that interest and attendance at the Properties viewing was very strong and that, based upon his experience, he anticipates robust auction participation.  *See id*.

#### 2.  *Testimony of Dwayne Murray, Chapter 11 Trustee*

Fannie Mae also obtained testimony from the Trustee.  The Court recognizes the Trustee's bona fides and finds him to be a credible, honest, and compelling witness.  The Trustee stated that he did not encourage or ask Fannie Mae to file a plan of liquidation.  Upon familiarizing himself with the condition of the Debtors' Properties and status of operations, he considered filing a motion

to convert the case to one under chapter 7.  In the end, he reached his own independent conclusion in the Fall of 2022 that the best exercise of his business judgment and to fulfill his fiduciary duty to the estates and creditors was to pursue an auction of the Properties.  *See* Hr'g Rec'ing 10:44–10:56 a.m.; 11:06–11:21 a.m. (Apr. 11, 2023).  He based that decision on (i) the "deplorable" condition of the Properties at the time he was appointed as Trustee; (ii) the fact that grossly insufficient revenue existed to operate the Debtors; (iii) reports he received from experts informing him of the amount of funding required to return the Properties to habitable conditions; and (iv) his experiences with the various emergencies that have befallen the Debtors post-petition, particularly a fire that wiped out almost half of the 94 units that his contractors had finished gutting in preparation for sale/renovation—occurring within days of completion of the project and at no small cost to the estates.  *See id.*  The Trustee reported that, at that point, he knew he had to conserve insurance proceeds and the very limited rents that were coming in and get the Properties to auction as soon as possible to preserve the value of the estates for creditors.  *See* Hr'g Rec'ing 11:06–11:21 a.m.

The Trustee testified that the estates currently hold approximately $11 million in segregated insurance proceeds.  *See* Hr'g Rec'ing 11:31–11:36 a.m.  The Trustee observed that auction proceeds and insurance proceeds were the only means available to pay creditors, and that he was confident that between those two sources, sufficient funds would exist to pay allowed amounts required under Fannie Mae's Plan due on or shortly after the Effective Date, including administrative expense and priority claims.  *See* Hr'g Rec'ing 11:40–11:44 a.m.[14]  The Trustee stated that he had been asked and identified by Fannie Mae to serve as the Liquidating Trustee,

---

[14]     The Trustee testified that he disagreed with Fannie Mae's position that proceeds of force-placed insurance policies are not property of the estate and, therefore, would not vest in the Liquidating Trust and distributed for the benefit of creditors.  *See supra* note 7.

that he believed that his service in that role was in the best interests of the estates as he had full knowledge of the case, and that, as Liquidating Trustee, he was prepared to and had years of experience in investigating and litigating claims against estates and causes of action belonging to estates. *See* Hr'g Rec'ing 11:40–:47 a.m.

### 3. Testimony of Joel Shaddox, Corporate Representative of Fannie Mae

Joel Shaddox testified on behalf of Fannie Mae. The Court finds Shaddox to be a reliable and forthcoming witness. Shaddox has been employed by Fannie Mae since July 2019 and serves as a senior asset manager in Fannie Mae's Special Asset Management department. *See* Hr'g Rec'ing 1:50–1:54 p.m. (Apr. 11, 2023).

Shaddox testified as to the basic functioning of Fannie Mae's liquidating Plan and the satisfaction of the elements of 11 U.S.C. § 1129. *See* Hr'g Rec'ing 1:49–3:08 p.m. He explained that Fannie Mae holds first-position security interests in the Properties to be auctioned, that Fannie Mae's debt is significantly undersecured, and that all proceeds from the auction are subject to Fannie Mae's liens. *See* Hr'g Rec'ing 2:49–2:55 p.m. He also explained that Fannie Mae is willing to gift a portion of its collateral to certain general unsecured creditors so they will be paid first through the Plan. *See* Hr'g Rec'ing 2:13–2:18 p.m.; 2:48–2:52 p.m. Shaddox further testified that he believed that the proceeds from the auction, coupled with the $11 million in insurance proceeds currently held by the Trustee would be sufficient to pay the amounts required to be paid under the Plan. *See* Hr'g Tr. Min. 3:01–3:08 p.m. Shaddox confirmed that all gifts to general unsecured creditors under the Plan will decrease the Fannie Mae's deficiency claim dollar for dollar. *See* Hr'g Tr. Min. 2:50–2:52 p.m.

### 4.  Objections to the Plan

Prior to the confirmation hearing, the UST objected to the exculpation, injunction, and gatekeeping provisions contained in the Plan.  [ECF Doc. 877].  Prior to and during the hearing, Fannie Mae worked with the UST to amend those Plan provisions and resolved the objections.

Bruno and non-debtor affiliates voted to reject the Plan and Bruno lodged several objections to Fannie Mae's Plan.  [ECF Doc. 880].  Bruno's scatter-shot objections are light on exposition, and most objections were resolved by consent at the confirmation hearing.  One objection stands, however:  Bruno contends that the Plan unfairly discriminates against Subclass 2D in violation of § 1129(b)(1) of the Bankruptcy Code.  *See id.*

## CONCLUSIONS OF LAW

This Court **shall** confirm a plan if all of the requirements of § 1129 of the Bankruptcy Code are met.  *See* 11 U.S.C. § 1129(a).  "A Chapter 11 plan, even though a liquidating plan, must still confirm to the same statutory requirements of any other Chapter 11 reorganization."  *In re 20th Century Enters., Inc.*, No. 90-23698, 1994 WL 779356, at *4 (Bankr. N.D. Miss. Jan. 18, 1994) (quoting *In re Deer Park, Inc.*, 136 B.R. 815, 816–19 (9th Cir. B.A.P. 1992)).  Fannie Mae, as the Plan proponent, bears the burden of establishing that each requirement for confirmation has been met by a preponderance of the evidence.  *See In re Sea Trail Corp.,* No. 11-07370, 2012 WL 5247175, at *4 (Bankr. E.D.N.C. Oct. 23, 2012) (citation omitted); *In re Multiut Corp.*, 449 B.R. 323, 332–33 (Bankr. N.D. Ill. 2011).  "The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of § 1129, regardless of the absence of valid objections to confirmation."  *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001) (citations omitted).

**A. Fannie Mae Has Carried Its Burden To Show Its Liquidating Plan Complies with Applicable Provisions of § 1129(a), but for § 1129(a)(8)**

 *1. Section 1129(a)(1)*

Section 1129(a)(1) incorporates the requirements of §§ 1122 and 1123, governing classification and contents of a plan. *See* H.R. Rep. No. 595, 95th Cong. 1st Sess. 412 (1977), S. Rep. No. 989, 95th Cong. 2d Sess. 126 (1978), U.S.C.C.A.N. 1978, pp. 5963, 5787, 5912, 6388. The Court observes that the Fannie Mae's Plan properly classifies claims and interests in accordance with §§ 1122 and 1123, as well as provides for the same treatment by the Debtors of each claim or interest in each respective class, thereby satisfying § 1123(a)(4). Bruno's objection regarding classification and subordination of the insider and intercompany claims was resolved by consent at the hearing. *See supra* note 13. Section 1123(a)(4) requires that a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The insider and intercompany claims are placed in the same Subclass as the SBA and all claims receive the same treatment under the Plan; therefore, the Plan does not violate § 1123(a)(4). *See* Plan, § 3.2. Thus, any remaining objection under § 1123(a)(4) is overruled.

 Further, the Court finds that Fannie Mae has provided adequate means for the Plan's implementation, thus satisfying § 1123(a)(5). The Plan will be funded by both auction and insurance proceeds. Given the amount of insurance proceeds currently held by the Trustee, the Trustee's testimony that additional insurance proceeds are forthcoming, the testimony of Box and the Trustee regarding the interest to date in the upcoming auction of the Properties, the required payment of the Carve Out pursuant to this Court's Bid Procedures Order, and Shaddox's testimony regarding gifting by Fannie Mae to general unsecured creditors, the Court concludes that there will

be sufficient cash to fund the Plan. Thus, the Court overrules any remaining objections under § 1123(a)(5).

### 2. *Section 1129(a)(2)*

Section 1129(a)(2) requires that the proponent of the plan comply with "applicable provisions" of the Bankruptcy Code, *i.e*., disclosure and solicitation requirements, which are "the paradigmatic example[s] of what Congress had in mind within it enacted § 1129(a)(2)." *In re Pearl Res. LLC*, 622 B.R. 236, 259 (Bankr. S.D. Tex. 2020) (citing *In re Trans World Airlines, Inc*., 185 B.R. 302, 313 (Bankr. E.D. Mo. 1995); *In re Texaco, Inc*., 84 B.R. 893, 906–07 (Bankr. S.D.N.Y. 1988)). On February 24, 2023, this Court issued an Order approving the adequacy of Fannie Mae's first amended disclosure statement and permitting Fannie Mae to solicit acceptances or rejections of its Plan. [ECF Doc. 746]. The threadbare objection raised by Bruno mistakes the purpose and intent of § 1129(a)(2), [ECF Doc. 880, at 10]; thus the Court overrules the objection and finds that Fannie Mae has satisfies the requirements of § 1129(a)(2).

### 3. *Section 1129(a)(3)*

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." The Court concludes that the Fannie Mae's Plan has not been proposed by any means forbidden by law. As to the requirement of good faith, "the Fifth Circuit has stated that the requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind that the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *In re Pearl Res. LLC*, 622 B.R. at 260 (citing *In re Sun Country Dev., Inc*., 764 F.2d 406, 408 (5th Cir. 1985)). Indeed, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc*.,

764 F.2d at 408.  Fannie Mae has proposed its Plan in order to implement the auction process proposed by the Trustee and to liquidate assets and distribute proceeds efficiently to the creditor body.  Bruno's summary objection is overruled.

### 4.  Section 1129(a)(4)

Section 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent, by the debtor[s], or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  Here, Fannie Mae's Plan incorporates the Bid Procedures Order, which requires this Court's approval of the final sale and transfer of the Properties as well as requires Fannie Mae to pay the Carve Out from auction proceeds.  No party in interest has objected to confirmation of the Plan under this section; the Court finds that the requirements of § 1129(a)(4) have been satisfied.

### 5.  Section 1129(a)(5)

Section 1129(a)(5) requires that Fannie Mae's Plan disclose any individual proposed to serve "as a director, officer, or voting trustee of the debtor[s]" and that the appointment is "consistent with the interests of creditors and equity security holders and with public policy."  Here, the Plan proposes to sell the Debtors' Properties, liquidate all remaining assets via a Liquidating Trust, and cancel the membership interests of the Debtors.  Dwayne Murray will be appointed as the Liquidating Trustee to oversee and administer the Liquidating Trust for the benefit of creditors.  No party objected to the Plan under this section.  The Court finds that the requirements of § 1129(a)(5) have been satisfied.

### 6. *Section 1129(a)(6)*

Section 1129(a)(6) requires that "any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor[s] has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." That provision is not applicable here.

### 7. *Section 1129(a)(7)*

The text of § 1129(a)(7), known as the "best interests" test, requires that each objecting creditor receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation of the Debtors. The Court observes that Fannie Mae's uncontested first-position security interests encumber substantially all of the Debtors' assets. It is an undisputed fact that Fannie Mae's debt is undersecured. Based on the liquidation analysis attached as Exhibit F to the Debtor's Plan, [ECF Doc. 745-6] and the testimony of the Trustee and Shaddox, the Court finds that if this case were converted to a chapter 7 liquidation, the amount of Fannie Mae's liens (> $35 million) would engulf all proceeds of the liquidation, and with no Carve Out or gift from Fannie Mae, unsecured creditors would be left without recovery. The Court concludes that Fannie Mae has met its burden to establish compliance with § 1129(a)(7) and overrules Bruno's objection under this section.

### 8. *Section 1129(a)(8)*

Section 1129(a)(8) requires Fannie Mae to show either that each class had accepted the Plan or that each class is not impaired under the Plan. Because Subclass 2D is impaired and voted to reject the Plan, Fannie Mae cannot meet its burden to satisfy this section.

### 9. Section 1129(a)(9)

Section 1129(a)(9) governs the manner in which administrative and unsecured priority claims must be paid unless the holder of a particular claim has agreed to a different treatment. Several taxing authorities have filed proofs of claim asserting priority unsecured claims for unpaid taxes under § 507(a)(8). *See* Plan, § 2.3. The Plan proposes to pay those allowed claims in full within thirty days of the Effective Date. Further, the Plan proposes to pay tenants' allowed priority unsecured claims for security deposits under § 507(a)(7) in full on the Effective Date. *See* Plan, § 2.4. The Plan also properly treats administrative expense claims. *See* Plan, §§ 2.1 & 2.2 The Court concludes that Fannie Mae has carried its burden under § 1129(a)(9) and overrules Bruno's objection under this section.

### 10. Section 1129(a)(10)

Section 1129(a)(10) requires that at least one non-insider, impaired class of creditors has accepted the Plan. Bruno summarily asserts that Fannie Mae has classified general unsecured claims to gerrymander an affirmative vote on its liquidating plan in violation of § 1129(a)(10) and § 1122, and asks this Court to designate Fannie Mae "based on its bad faith conduct or control over Debtor's operations, which renders it an insider. . . [or] based on its buying certain creditors' votes." [ECF Doc. 880, at 7–8].

Fannie Mae's secured claim is classified separately in Class 1 and is impaired. Its deficiency claim is also classified separately in Subclass 2E and is impaired. Voting in both classes, Fannie Mae has voted to accept its own Plan. Section 1126(a) of the Bankruptcy Code expressly provides that each holder of a claim has the right to vote for or against a proposed plan; no section of the Bankruptcy Code limits that right to non-proponents of a Plan. Rather, a bankruptcy court "may designate any entity whose acceptance or rejection of such plan was not in

good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title." 11 U.S.C. § 1126(e). Bruno's objection is overruled; no evidence of lack of good faith on behalf of Fannie Mae is before the Court. *See In re 431 W. Ponce de Leon, LLC*, 515 B.R. 660, 677 (Bankr N.D. Ga. 2014) (citing *In re Allegheny Int'l, Inc*., 118 B.R. 282, 289–91 (Bankr. W.D. Pa. 1990); *In re Fed. Support Co*., 859 F.3d 17, 19–20 (4th Cir. 1998); *In re Pleasant Hill Partners, L.P*., 163 B.R. 388, 392–95 (Bankr. N.D. Ga. 1994)). Even if the Court were to designate Fannie Mae, two other impaired classes have voted to accept the Plan: Subclass 2B (Tenants) and Subclass 2C (SWB). [ECF Doc. 891]. Accordingly, § 1129(a)(10) is satisfied.

> *11. Section 1129(a)(11)*

The text of § 1129(a)(11), known as the "feasibility test," requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor[s] or any successor to the debtor[s] under the plan, unless such liquidation or reorganization is proposed in the plan." The feasibility standard requires this Court to consider whether the Plan offers a reasonable probability of success. "When assessing whether a plan or reorganization is feasible, bankruptcy courts consider factors such as the adequacy of the debtor's capital structure, the earning power of the business, economic conditions, the ability of management, the probability of the continuation of the same management, and any other related matter." *In re Two Streets, Inc*., 597 B.R. 309, 317 (Bankr. S.D. Miss. 2019) (citation omitted).

But a feasibility analysis differs when assessing a liquidating plan. "The focus of the analysis is whether the liquidation itself, as proposed in the plan, is feasible." *Id*. "In other words, § 1129 requires a debtor to show that it can accomplish what it proposes to do, in the time period allowed, on the terms set forth in the plan." *Id*. (internal quotations and citations omitted). Here, the Court finds that the plan is feasible. The Bid Procedures Order, as amended, provides for an

auction date of May 1, 2023. Both the Trustee and Box testified that they anticipate a successful auction that will derive proceeds sufficient to fund the Plan. The Plan does not rely only upon auction proceeds to fund the Plan, however. Plan payments will also be made using $11 million of insurance proceeds on hand as well as incoming insurance proceeds. Accordingly, the feasibility requirement is met and the Court overrules any objections under this section.

### 12. Section 1129(a)(12)

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan." The Plan requires all such fees to be paid as they become due until final decrees are entered in the Debtors' bankruptcy cases. *See* Plan, § 6.18. The Court finds that Fannie Mae has satisfied its burden under this section and any objection is overruled.

### 13. Section 1129(a)(13)

Section 1129(a)(13) requires that a plan provide for "the continuation after its effective date of payment of all retiree benefits," as defined and required by § 1114 of the Bankruptcy Code, "at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits." That provision is not applicable in this case.

### 14. Section 1129(a)(14)

Section 1129(a)(14) requires a debtor to keep current on any domestic support obligations "required by a judicial or administrative order, or by statute" that becomes payable after the Petition Date. That provision is not applicable in this case.

### 15. Section 1129(a)(15)

Section 1129(a)(15) is inapplicable here as it only applies to individual debtors.

*16. Section 1129(a)(16)*

Section 1129(a)(16) requires that all transfers of property by a "corporation or trust that is not a moneyed, business or commercial corporation or trust" be made in accordance with applicable provision of nonbankrutpcy law. Here, the Debtors are for-profit entities, so § 1129(a)(16) is inapplicable.

### B. Fannie Mae's Plan Complies with § 1129(b) of the Bankruptcy Code

Notwithstanding the fact that Subclass 2D, an impaired class of insiders, non-debtor affiliates, and the SBA holding general unsecured claims, has voted to reject the Plan, the Plan should nevertheless be confirmed if the Plan "does not discriminate unfairly, and is fair and equitable, with respect to" Subclass 2D. 11 U.S.C. § 1129(b)(1). "This is commonly referred to as the 'cram down' provision, and it requires a court to separately analyze whether the plan unfairly discriminates against any impaired rejecting classes and whether the plan is fair and equitable to those classes." *In re Sea Trail Corp*., No. 11-07370, 2012 WL 5247175, at *4 (Bankr. E.D.N.C. Oct. 23, 2012).[15]

The Bankruptcy Code does not define or provide a standard for evaluating "unfair discrimination" under § 1129(b)(1). Instead, courts must examine the facts and circumstances of

---

[15] The Plan here complies with the absolute priority rule. That rule requires the class of claims that rejected a plan (Subclass 2D) to be paid in full before classes junior to it receive or retain any property under the Plan on account of their claims. The only class junior to Subclass 2D is Class 4, comprised of the membership interests in the Debtors. The Plan provides for the following treatment of that class:

> All existing Member Interest in the Debtors shall be cancelled on the Effective Date. Each holder of Member Interests in the Debtor shall neither receive nor retain any property or interest in property on account of such Interest except as provided in the following sentence. In full and final satisfaction, release, and discharge of an in exchange for each Allowed Class 4 claim, holders of such Class 4 Claims shall receive pro rata payments from the Liquidating Trustee of any funds held in the Liquidating Trust **following the payment in full of all Class 2 (A, B, C, D & E) Claims.**

*See* Plan, § 3.4 (emphasis added). Thus, the matter before the Court here concerns only the equality of treatment between classes of equal priority.

24

the particular case to determine whether unfair discrimination exists. *See In re Idearc Inc*., 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009) (citations omitted). "The criteria of unfair discrimination preserves the fair treatment of a dissenting class from that class's own perspective." *In re Bankston*, No. 09-10675, 2010 WL 1027806, at *13 (Bankr. W.D. La. Jan. 15, 2010). Indeed,

> unfair discrimination is best viewed as a horizontal limit on nonconsensual confirmation. . . . Just as the fair and equitable requirement [of § 1129(b)(1)] regulates priority among classes of creditors having higher and lower priorities, creating inter-priority fairness, so the unfair discrimination provision promotes intra-priority fairness, assuring equitable treatment among creditors who have the same level of priority.

*In re Sentry Operating Co. of Tex., Inc*., 264 B.R. 850, 863 (Bankr. S.D. Tex. 2001) (quoting Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L.J. 227, 227–28 (1998)). "At a minimum . . . the unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so." *In re Idearc Inc*., 423 B.R. at 171; *see also In re Sentry Operating Co. of Tex., Inc*., 264 B.R. at 864–65.

Fannie Mae does not contest the fact that the Plan discriminates against Subclass 2D: The Plan contemplates that general unsecured creditors in Subclass 2A will be paid in full on the Effective Date, while Subclass 2D claims will be subjected to the claims allowance process via the Liquidation Trust Agreement and must wait on a distribution (if any) that will be shared *pro rata* with other general unsecured creditors, including the SWB, the one opt-out tenant, Fannie Mae (deficiency claim), and the SBA. *See* Plan, § 3.2. But is that discrimination unfair? As other courts have done, this Court implements the well-founded "rebuttable-presumption" test for unfair discrimination proposed by Professor and former Bankruptcy Judge Bruce A. Markell. *See, e.g*., *In re CE Elec. Contractors, LLC*, No. 21-20211, 2022 WL 1420094, at *3 (Bankr. D. Conn. May 4, 2022); *In re Sentry Operating Co. of Tex., Inc*., 264 B.R. 850, 863–64 (Bankr. S.D. Tex. 2001);

*In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000); *In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999). Under the Markell test, a rebuttable presumption of unfair discrimination would arise where there is

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 228 (1998). But

> [t]he plan proponent may overcome the presumption based on different percentage recoveries by showing that a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization. The presumption of unfairness based on differing risks may be overcome by a showing that the risks are allocated in a manner consistent with the prebankruptcy expectations of the parties.
>
> . . . .
>
> In either case—disparity of recovery or disparity of risk—the plan proponent can rebut the presumption of unfairness by proving that the difference in treatment is attributable to differences in the prepetition status of the creditors. In the case of a difference in the present value of the recovery, the presumption may also be overcome by a demonstration that contributions will be made by the assenting classes to the reorganization, and that these contributions are commensurate with the different treatment. In such cases, while discrimination exists, it is not unfair.

*See id.* at 228, 250.

Here, the Court finds that a presumption of unfair discrimination has arisen. Subclass 2D is impaired and has rejected the Plan. Subclass 2D is on par with Subclass 2A, yet Subclass 2A receives 100% recovery of its claims under the Plan immediately on the Effective Date, while Subclass 2D must wait to share in an uncertain recovery from the Liquidating Trust at some future date. The Plan makes no estimate regarding Subclass 2D's recovery. The record reflects, however,

that Subclass 2D creditors (insiders, non-debtor affiliates, and the SBA) will share *pro rata* in distributions from the Liquidating Trust with, among others, the SWB (which filed a $3 million claim) and Fannie Mae (which estimates its deficiency claim to be in the range of $5–$15 million, *see* Plan, § 3.2). Thus, based on the record in this case, the Court finds that the difference in the Plan's treatment of Subclass 2A and Subclass 2D results in a materially lower percentage recovery for Subclass 2D and also allocates a materially greater risk of recovery to Subclass 2D.

To overcome the presumption of unfair discrimination, Fannie Mae asserts that, because it holds senior perfected liens on the Debtors' assets and its debt is woefully undersecured, none of the general unsecured creditors, Subclass 2D included, has any legal right to a distribution. Hr'g Rec'g 2:13–2:18 p.m.; 2:48–2:52 p.m.; 4:20–4:22 p.m.; 4:27–4:30 p.m.; 4:48–4:52 p.m. (Apr. 11, 2023). Thus, Fannie Mae argues, its choice to "gift" a portion of its collateral to certain Subclasses through the Plan does not result in unfair discrimination. The Court agrees. If the liquidation of the Debtors' estates were to occur in a state law foreclosure action, Subclass 2D could expect no recovery, given the Fannie Mae's liens on the Debtors' assets and the undisputed fact that Fannie Mae's debt is undersecured. Further, Subclass 2D creditors—particularly the insiders—dealt with the Debtors prepetition knowing that the Debtors' assets were fully encumbered by Fannie Mae's perfected liens and that, in a foreclosure scenario, their recovery could be reduced or eliminated depending upon the value of the Properties securing repayment of the debt. Consequently, the risks of little or no recovery allocated to them now in the Plan is consistent with their prebankruptcy expectations. Applying the Markell test, the Court finds the Plan does not unfairly discriminate against Subclass 2D.[16]

---

[16] The Court's analysis is influenced by the fact that these Debtors have not operated and generated sufficient income to service the debt owed to Fannie Mae or pay estate expenses such as property insurance since entering chapter 11. Evidence placed before the Court justified the installation of a chapter 11 Trustee, who, after considering the option of converting the case to one under chapter 7, decided in his business

## CONCLUSION

For the foregoing reasons, this Court confirms the *Amended Creditor's Plan of Reorganization for the Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code*, [ECF Doc. 916], filed by the Federal National Mortgage Association and overrules all objections.

---

judgment to initiate an auction process to sell the assets of the Debtor. The Plan implements that auction process and provides a structure to distribute auction and insurance proceeds—all of which are Fannie Mae's collateral. Compare these jointly administered cases with those in *In re Sentry Operating Co. of Texas, Inc.* There, the court considered a plan whereby the lender, which held perfected liens on all of the debtors' assets but was appreciably undersecured, would acquire the substantively consolidated debtors' assets as going concern with local goodwill intact. 264 B.R. 850, 855–56 (Bankr. S.D. Tex. 2001). To maintain that goodwill, the plan proposed to pay trade claims in full, but would pay minimal amounts to other unsecured creditors. *See id.* The lender made the same argument that Fannie Mae makes here. After considering classification and unfair discrimination objections, the court denied confirmation of the plan, writing:

> To accept [the lender's] argument that a secured lender can, without any reference to fairness, decide which creditors get paid and how much those creditors get paid, is to reject the historical foundation of equity receiverships and to read the § 1129(b) requirements out of the Code. . . .

> There are devices at law, such as foreclosure, in which the secured lender is not required to negotiate with unsecured creditors, to obtain consent of at least one class of impaired creditors, or to be fair. But the advantage of an equity receivership, and its descendant the chapter 11 reorganization, are (among others) (i) that going concern value is preserved or enhanced, (ii) that the debtor (in this case in league with the secured lender) is left in possession and control of the business to decide how to restructure it, (iii) that executory contracts can be assumed or rejected, (iv) that preferences and fraudulent conveyances can be recovered, and (v) that all other creditors are held at bay under an automatic stay while the plan is formulated and implemented. The Bankruptcy Code establishes the price of these powerful equitable tools (when any class of creditors is impaired) as negotiation to win over the acceptance of an impaired class and treatment of all non-accepting classes fairly, equitably, and without unfair discrimination. [The lender] proposes to obtain the benefits of equitable tools without paying the price. The statute has no provision for that, and the Court is unwilling to read these requirements out of the Code.

*Id.* at 865–66. The court acknowledged, however, that "[t]he fact that [objecting unsecured creditors] would receive nothing in a liquidation might or might not be influential under the right circumstances." *Id.* at 866. The Court finds those circumstances here. Unlike the debtors in *Sentry Operating*, the Debtors' businesses are not operating as a going concern, the Properties are scheduled to be sold at auction by the Trustee, and the Plan proposes that the membership interests in the Debtors will be cancelled. In a liquidation under state law, general unsecured creditors would receive nothing. But in these chapter 11 cases, even though Fannie Mae will not benefit from any release or exculpation provision in the Plan, it is willing to gift part of its collateral so that unsecured creditors may receive a distribution. The legitimate concerns raised by the *Sentry Operating* court are not implicated here given the contours of the jointly administered cases before this Court.

28

An Order consistent with this Memorandum Opinion and Order will be entered on the docket contemporaneously herewith, confirming Fannie Mae's Plan and denying as moot Bruno's plans of reorganization that are currently set for trial on April 27 and 28, 2023, [ECF Docs. 814–824], as well as all pending motions related to that trial.

New Orleans, Louisiana, this 19th day of April, 2023.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

.