## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | § | |
|---|---|---|
| IN RE: | § | CASE NO: 22-10082 |
| | § | |
| WESTBANK HOLDINGS, LLC, *et al.*,[1] | § | CHAPTER 11 |
| | § | |
| DEBTOR. | § | SECTION A |
| | § | |

### MEMORANDUM OPINION AND ORDER

On November 22, 2023, this Court held a hearing to consider the *Motion for Allowance and Payment of Administrative Expense Claims* and the exhibits attached thereto (the "Motion"), [ECF Doc. 1142], filed by Metro Wide Apartments II, LLC ("Metro Wide"). Through the Motion, Metro Wide seeks allowance of an administrative expense claim pursuant to 11 U.S.C. §§ 503(a) and (b)(1) in the total amount of $137,842.97 in fees for post-petition management of the Debtors' properties.[2] Dwayne M. Murray (the "Liquidating Trustee") and Federal National Mortgage Association, d/b/a Fannie Mae ("Fannie Mae") both oppose the relief sought in the Motion. [ECF Docs. 1168 & 1169].

For the reasons stated below, the Motion is **DENIED**.

---

[1]    The Court entered an Order on February 4, 2022, directing joint administration of the chapter 11 bankruptcy case of Westbank Holdings, LLC, as lead case, with the chapter 11 bankruptcy cases of affiliated debtors, Cypress Park Apartments II, LLC (No. 22-10083), Forest Park Apartments, LLC (No. 22-10085), Liberty Park Apartments, LLC (No. 22-10084), and Washington Place, LLC (No. 22-10086). [ECF Doc. 17].   On March 14, 2022, the Court entered an Order directing the joint administration of the chapter 11 bankruptcy case of Riverview Apartments, LLC with those affiliated cases.   [No. 22-10176, ECF Doc. 19].   All record cites derive from No. 22-10082 unless otherwise indicated.

[2]    The Motion reflects Metro Wide's request for allowance of an administrative expense claim in the amount of $145,944.90; however, Metro Wide amended Exhibit A to the Motion on December 13, 2023, to change its total request to $137,842.97.  [ECF Doc. 1220].

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334.  The matter presently before the Court constitutes a core proceeding this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2).  The venue of the Debtor's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409.

## FINDINGS OF FACT[3]

In two prior opinions, this Court documented the prepetition history of the Debtors, the reasons for the Court's appointment of a chapter 11 trustee, and the confirmation of a plan of liquidation proposed by Fannie Mae, the lender holding a senior perfected blanket lien over substantially all of the Debtors' assets.  [ECF Docs. 444 & 965].  Each of the six Debtors entered chapter 11 as a single-asset real estate holding company for multifamily apartment buildings providing subsidized rental housing for low-income families in the greater New Orleans area. Joshua Bruno is the single member-manager for each Debtor.  Because each Debtor had no employees, another of Bruno's closely held companies, Metro Wide, provided property management services to the Debtors prior to the filing of the petitions for bankruptcy relief.  [ECF Doc. 444, ¶ 3].

**A.     This Court Approved Up To $18,991 To Be Paid by the Debtors to Metro Wide for Management Fees Using Fannie Mae's Cash Collateral.**

The record reflects that, at the beginning of the Debtors' jointly administered bankruptcy cases, five of the Debtors, each operated by Bruno, filed motions to use cash collateral securing repayment of the debt owed to Fannie Mae.  [No. 22-10082, ECF Doc. 8; No. 22-10083, ECF Doc.

---

[3]     To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

8; No. 22-10084, ECF Doc. 8; No. 22-10085, ECF Doc. 8; No. 22-10086, ECF Doc. 8].[4]  As to

property management fees proposed to be paid to non-debtor affiliate Metro Wide, the Debtors'

motions stated that the proposed payments "are consistent with pre-petition payments made to

Metro-Wide and are relatively minor." *E.g.*, ECF Doc. 8, ¶ 24.  Those motions each attached a

three-week budget that proposed that each Debtor would pay property management fees during

that period in the following amounts (the "First Interim Budget"):

| January 31, 2022 Emergency Motions To Use Cash Collateral<br>For First Interim Period of January 27, 2022, to February 16, 2022 | |
| --- | --- |
| Debtor | Budgeted Property Management Fees |
| Westbank Holdings, LLC | $2,790 |
| Cypress Park Apartments II, LLC | $366 |
| Liberty Park Apartments, LLC | $316 |
| Forest Park Apartments, LLC | $528 |
| Washington Place, LLC | $169 |
| **TOTAL INTERIM MANAGEMENT FEES** | **$4,169** |

Fannie Mae objected to the Debtors' motions to use cash collateral, but consented to the

interim relief requested by the Debtors "solely to the extent set forth in the Debtors' initial three

(3) week budget attached to the Motion."  [ECF Doc. 15, ¶ 9].  On February 4, 2022, the Court

issued an Order approving the use of cash collateral on an interim basis only up to amount

identified on the First Interim Budget and scheduled a hearing for February 14, 2022 to resolve

the motions on a final basis.  [ECF Doc. 19].  At the hearing on February 14, the Court approved

the First Interim Budget on a final basis.  [ECF Doc. 37].  Also at that hearing, the Debtors

proposed, and the Court approved on an interim basis, a second budget covering the next four-

week period from February 17, 2022 to March 16, 2022, proposing payment of property

---

[4]      On February 23, 2022, the sixth Debtor, Riverview Apartments, LLC filed for chapter 11
bankruptcy relief.  [No. 22-10176, ECF Doc. 1].

management fees during that period up to the following amounts (the "Second Interim Budget").

[ECF Doc. 37]:[5]

| January 31, 2022 Emergency Motions To Use Cash Collateral For Second Interim Period of February 17, 2022, to March 16, 2022 | |
|---|---|
| Debtor | Budgeted Property Management Fees |
| Westbank Holdings, LLC | $2,762 |
| Cypress Park Apartments II, LLC | $580 |
| Liberty Park Apartments, LLC | $315 |
| Forest Park Apartments, LLC | $636 |
| Washington Place, LLC | $244 |
| **TOTAL INTERIM MANAGEMENT FEES** | **$4,537** |

On March 9, 2022, after notice and hearing, the Court granted the Second Interim Budget on a final basis, ordering that "[t]he Debtors shall be permitted to use Cash Collateral solely to pay the expenses and costs set forth in the respective Budgets during the pendency of this case, in an amount not to exceed those amounts set forth in the Budget, subject to Permitted Variances." [ECF Doc. 92]. The Order further stated that "[t]he Budget may be supplemented, modified, or extended upon court approval after notice and hearing or by the consent of Fannie Mae." *See id.*

The Debtors did not come forward at any point to modify the budget as to property management fees. Instead, on April 27, 2022, the Debtors moved to employ Trinity Property Management, LLC d/b/a Trinity Multifamily ("Trinity") as an independent contractor to manage the Debtors' properties. [ECF Doc. 170 and, as supplemented and amended, ECF Docs. 204 & 223]. That motion, as discussed further below, was granted by this Court at a hearing on May 23, 2022. [ECF Doc. 298]. Thus, the maximum amounts approved by this Court for the Debtors to

---

[5]     On March 4, 2022, Riverview Apartments, LLC filed its own emergency motion for use of cash collateral; its interim budget for the period of February 24, 2022 to March 16, 2022, proposed that the Debtor would not be required to pay property management fees. [No. 22-10176, ECF Doc. 11].

pay property management fees to Metro Wide between the Petition Date and May 23, 2022 were

as follows:

| Amounts Approved for Debtors' Payment of Property Management Fees to Metro Wide Using Cash Collateral From Petition Date to May 23, 2022 | | | | | | |
|---|---|---|---|---|---|---|
| DEBTOR | 01/27–02/16 First Interim Budget | 02/17–03/16 Second Interim Budget | 03/17–04/16 Final Budget | 04/17–05/16 Final Budget | 05/17–05/24 Final Budget (Prorated) | TOTAL |
| Westbank Holdings | $2,790 | $2,762 | $2,762 | $2,762 | $737 | $11,813 |
| Cypress Park | $366 | $580 | $580 | $580 | $155 | $2,261 |
| Liberty Park | $316 | $315 | $315 | $315 | $84 | $1,345 |
| Forest Park | $528 | $636 | $636 | $636 | $170 | $2,606 |
| Washington Place | $169 | $244 | $244 | $244 | $65 | $966 |
| TOTAL | $4,169 | $4,537 | $4,537 | $4,537 | $1,211 | **$18,991** |

A review of the Debtors' monthly operating reports ("MORs") reveals that the Debtors

paid Metro Wide property management fees invoiced to the Debtors between the Petition Date and

May 23, 2022 as follows:[6]

| Amounts Paid By Debtors to Metro Wide for Property Management Fees Between the Petition Date and May 23, 2022 | | | | | | |
|---|---|---|---|---|---|---|
| DEBTOR | January 2022 MOR | February 2022 MOR | March 2022 MOR | April 2022 MOR | May 2022 MOR | TOTAL |
| Westbank Holdings | $0 | $2,791 | $1,927 | $0 | $3,133 | $7,851 |
| Cypress Park | $0 | $366 | $400 | $0 | $506 | $1,272 |
| Liberty Park | $0 | $316 | $297 | $0 | $532 | $1,145 |
| Forest Park | $0 | $528 | $515 | $0 | $1024 | $2,067 |
| Washington Place | $0 | $169 | $233 | $0 | $476 | $878 |
| TOTAL | $0 | $4,170 | $3,372 | $0 | $5,671 | **$13,213** |

---

[6]     [No. 22-10082, ECF Docs. 85 (WBH Jan. '22), 122 (WBH Feb. '22), 145 (WBH Mar. '22), 297 (WBH Apr. '22)]; [No. 22-10083, ECF Docs. 32 (CP Jan. '22), 33 (CP Feb. '22), 36 (CP Mar. '22), 39 (CP Apr. '22), 41 (CP May '22)]; [No. 22-10084, ECF Docs. 32 (LP Jan. '22), 34 (LP Feb. '22), 37 (LP Mar. '22), 39 (LP Apr. '22), 41 (LP May '22)]; [No. 22-10085, ECF Docs. 32 (FP Jan. '22), 33 (FP Feb. '22), 36 (FP Mar. '22), 38 (FP Apr. '22), 40 (FP May '22)]; [No. 22-10086, ECF Docs. 32 (WP Jan. '22), 34 (WP Feb. '22), 37 (WP Mar. '22), 39 (WP Apr. '22), 41 (WP May '22)].

**B.  The Court Approves the Debtors' Employment and Compensation of a Third-Party Property Manager.**

At the May 23, 2022 hearing in this case, the Court authorized the Debtors to employ Trinity as Property Manager.  [ECF Doc. 298].  On June 6, 2022, the Court issued an Order approving six post-petition management agreements among the Debtors and Trinity (the "Trinity Agreements").  [ECF Doc. 298, Exs. A–F].  Those agreements, as negotiated by Bruno, the sole member-manager of each of the Debtors as well as Metro Wide, envisioned that Metro Wide would provide infrastructure to Trinity in the form of back-office support[7] as well as vehicles for on-site property management.[8]  Several parties in interest objected to Metro Wide's ongoing involvement in the management of the Debtors' property.  Ultimately, the parties agreed upon a fee-splitting compensation structure between Trinity and Metro Wide:

9.1    Manager's Compensation

a)    Management Fee.

---

[7]    The Trinity Agreements provide:

Metro Wide, II, LLC ("MWII") will provide office furniture, computers, cell and office phones, phone numbers, fiber optic connections, power back up, safe, file cabinets, fire proof cabinets, scanners, commercial copiers, specialized cameras, servers, accounting software, technology, tools, equipment, emails, websites, marketing software (Sales Force), Human Resources software (Jazz HR), office supplies and other associated physical needs to operate the management and maintenance of the Property, which ownership [Debtor] does not possess or own ("MWII Assets"). . . .

[ECF Doc. 298, Ex. A, § 3.12].

[8]    The Trinity Agreements provide:

Subject to Manager's [Trinity's] commercially reasonable determination that there is a specific need for vehicles or golf carts, similar to those set forth on Schedule C, for property management, and that the rates are reasonable; MWII will provide one or more of the insured vehicles or golf carts set forth on Schedule C.  Each vehicle will be invoiced at the rate set forth on Schedule C to the Owner [Debtor], which rate will be reviewed every 6 months by Manager and Ownership.  The rate paid to MWII for the lease of the vehicles and golf carts identified on Schedule C shall be in addition to the 2%/Minimum Fee paid to MWII.  (Pro-rated per unit where the equipment is used for more than one property.)

[ECF Doc. 298, Ex. A, § 3.13].

Each month Manager shall receive remuneration for its services in managing the respective Properties in an amount equal to:

i)      As per Schedule A,

        a.      For Management:  3% of the gross monthly income plus costs incurred as set forth in the Approved Budget

        b.      For Leasing:  (TBD with Approved Budget)

        c.      Lease Renewal Fee:  (TBD with Approved Budget)

        d.      For Software Property Management:  $2.50 per unit per month

        e.      One-time flat fee for set up and onboarding: $1,000.00

        f.      Property Payroll for all team member [*sic*] needed for property operations

ii)      The management fee based on income, amounting to a percentage of all income actually collected and remitted during the month, shall include all income except:

- Monies collected for capital items, which are paid by tenants.

- Proceeds from casualty and condemnation actions or from insurance claims.

- Monies collected for real estate taxes and insurance payments.

- Animal rent, animal fee, application fee, eviction fees.

- Any past due rent owed to Owner as of the Effective Date of this Agreement.

iii)      DISTRIBUTIVE SHARE.  The gross operating income and compensation from this Agreement shall by allocated between Manager and [Metro Wide] as identified in Schedule "A".

9.2     MWII [Metro Wide] Fee

   a. **Each month MWII shall receive remuneration for its services in supporting back-end operations for the respective Properties in an amount which shall be the greater of**:

     1. A minimum fee, independent of income, payable monthly. The amount of such fee, if any is payable, is shown in Schedule "A" ("Minimum Fee"); **or**

     2. A management fee based on income, amounting to a percentage of all income actually collected and remitted during the month. The percentage is show in Schedule "A". For purposes of the Management fee computation all income shall include:

      • Monies collected for damage caused by tenants, which are paid for by tenants.

   b. In the event the Owner receives additional insurance proceeds after the Effective Date and the Owner requires assistance in distributing said funds, MWII may seek approval to assist the Debtor in distributing the insurance funds and paying expenses. Any fee paid to MWII in connection with the distribution of any insurance proceeds will have to be included in an Approved Budget and subject to Bankruptcy Court approval.

   c. DISTRIBUTIVE SHARE. The gross operating income and compensation from this Agreement shall be allocated be allocated between Manager and WMII as identified in Schedule "A".

   d. The amount set forth on Schedule C for a Service Vehicle needed as determined by Manager for operations of the Property.

   e. For services provided during the Term, the compensation paid to MWII under this Agreement shall be the exclusive vehicle for payments made by Owner to MWII.

[ECF Doc. 298, Ex. A, §§ 9.1 & 9.2] (emphasis added).[9]

---

[9] Schedule A, attached to and incorporated in the Trinity Agreements, states:

  **<u>MANAGER COMPENSATION</u>**
   a. Compensation to be paid to Manager

    1) For Management: 3% of the gross monthly income plus costs incurred as set forth in the Approved Budget

    2) For Leasing: (TBD with Approved Budget)

Each of the Trinity Agreements substantively contains the same compensation terms. [ECF Doc. 298, Exs. A–F]. Essentially, Trinity and Metro Wide would split a management fee of 5% of the gross monthly income for each Debtor, with Metro Wide receiving a guaranteed minimum amount per month from each Debtor if 2% of that Debtor's gross revenue did not exceed that minimum amount. The Trinity Agreements provided the following guaranteed minimum monthly payments due to Metro Wide from each Debtor:

      a.   Westbank Holdings, LLC: $2,500, [ECF Doc. 298, Ex. A, Sch. A]

      b.   Riverview Apartments, LLC: $1,100, [ECF Doc. 298, Ex. B, Sch. A]

      c.   Liberty Park Apartments, LLC: $280, [ECF Doc. 298, Ex. C, Sch. A]

      d.   Forest Park Apartments, LLC: $480, [ECF Doc. 298, Ex. D, Sch. A]

      e.   Washington Place Apartments, LLC: $500, [ECF Doc. 298, Ex. E, Sch. A]

      f.   Cypress Park Apartments II, LLC: $1,320, [ECF Doc. 298, Ex. F, Sch. A]

In addition to the greater fee of 2% of the Debtor's rental income or the minimum monthly fee, the Trinity Agreements provided the option for Trinity to lease vehicles through Metro Wide. *See, e.g.*, [ECF Doc. 298, Ex. A., § 3.13 & Sch. C].

---

          3)  Lease Renewal Fee: (TBD with Approved Budget)

          4)  For Software Property Management: $2.50 per unit per month

          5)  Set up on boarding fee: $1,000.00

          6)  Property Payroll for all team members needed for property operations

      b.  Compensation to be paid to MWII

          1)  For Support Fee and MWII Assets: The greater of, (a) 2% of the gross monthly income; or (b) a minimum monthly fee of $2,500;

          2)  If any equipment identified on Schedule C is leased, the amount set forth on Schedule "C" for any equipment actually leased at the request of Manager.

[ECF Doc. 298, Ex. A, Sch. A]. Schedule C identifies vehicles owned by Metro Wide available for leasing by Trinity at Trinity's option.

### C. The Court Appoints a Chapter 11 Trustee, Who Replaced Trinity With Another Property Manager for the Debtors' Properties.

In early June 2022, the Court held a four-day evidentiary hearing to consider Fannie Mae's motion to appoint a chapter 11 trustee to administer the Debtors' cases for cause under § 1104 of the Bankruptcy Code.  Creditors including the Sewerage and Water Board of New Orleans and numerous tenants joined Fannie Mae's motion.  On August 1, 2022, the Court issued a *Memorandum Opinion and Order*, making numerous findings regarding, among other things, the deplorable conditions of the Debtors' properties and the unlikelihood that any could be made habitable and income-producing without a radical intervention:

> The practical realities of this case are these:  (i) the Debtors' assets are in a state of abject decrepitude, unable to be renovated and become income-producing again without a massive investment of resources; (ii) the sole member-manager of the Debtors has demonstrated neither honesty and trustworthiness nor a willingness to operate the Debtors for the benefit of his creditors rather than himself; and (iii) the creditor body—which includes scores of the most vulnerable citizens of this community as well as a lender and quasi-public entities who are owed millions—lacks confidence in [the Debtors' principal] to manage the renovations and operation of the Debtors with integrity.  It is true that the Debtors have retained valuable teammates in the CRO, [general contractor], and Trinity, but in the end, those professionals are given no real autonomy and must report to [the Debtors' principal], who currently retains complete authority over the operation and management of the Debtors.

*In re Westbank Holdings, LLC*, No. 22-10082, 2022 WL 3052135, at *15 (E.D. La. Aug. 1, 2022).  The Court issued an Order instructing the United States Trustee's Office to appoint a chapter 11 trustee in the best interests of creditors and the estate.  [ECF Doc. 445].

Back in April 2022, the City of New Orleans partnered with tenants' rights advocates to start relocating residents of Westbank Holdings, LLC's properties due to "the unsuitable and hazardous conditions."  *In re Westbank Holdings, LLC*, 2022 WL 3052135, at *9.  The Court issued Orders between August and October 2022 allowing the Debtors to terminate leases at the Westbank Holdings properties and to continue to work with tenants, tenants' rights advocates, and

the City of New Orleans to transition tenants and pets to alternative housing so that the newly appointed trustee could secure the properties. [ECF Docs. 466, 483, 502, 516 & 555]. Ultimately, the trustee concluded that, although the Debtors' insurance counsel continued to pursue claims associated with hurricane and vandalism damage suffered at the properties, the damage to the properties was too extensive to be cost-effectively renovated and thus an auction and sale of all of the Debtors' properties was in the best interests of creditors and the estate. [ECF Doc. 570]. To prepare the properties for sale, the Trustee expended resources to secure the properties, protect them from further vandalism, and make high-priority, structural repairs to the buildings. [ECF Docs. 604, 607, 641, 647, 669, 752, 802, 806 & 967 (August 2022–March 2023 MORs)]. This Court approved a sale process and the Debtors' properties were auctioned on May 1, 2023. [ECF Docs. 637 & 985]. Ultimately, the Court confirmed a plan of liquidation proposed by Fannie Mae which incorporated the chapter 11 trustee's sale process. [ECF Doc. 965 & 966]. The Liquidating Trustee filed a Notice of Effective Date for the confirmed plan of liquidation on September 20, 2023. [ECF Doc. 1119].

In the meantime, in late January 2023, the chapter 11 trustee moved the Court for an expedited hearing on his motion to replace Trinity with another property manager, Tarantino Property Management, LLC ("Tarantino"). [ECF Doc. 697]. Acknowledging that he inherited Trinity as a property manager from the debtors-in-possession, the trustee stated in the motion that he "kept Trinity on as property manager to avoid a gap in property management service provided to the tenants and the properties," but "determined that Trinity is not properly managing the apartment complexes and believes in his business judgment that it is in the best interests of the Debtors' estates for a new property management company to manage the properties." [ECF Doc. 697, ¶ 5]. On February 1, 2023, the Court granted the trustee's unopposed request on an interim

11

basis, and on March 10, 2023, the Court entered an Order granting Tarantino's employment on a

final basis.  [ECF Docs. 716 & 781].

> ### D. The Debtors' Monthly Operating Reports Reveal that the Debtors Generated Little to No Rents During Trinity's Tenure and Did Not Compensate Trinity or Metro Wide Pursuant to the Trinity Agreements.

A review of the Debtors' MORs indicates that in June 2022, the Debtors received nominal

income through rents and rent subsidies and that the Debtors paid neither Trinity nor Metro Wide

under the Trinity Agreements.[10]   The lack of rental income makes sense, as, at that time, the

Debtors' properties were unlivable.  *See In re Westbank Holdings, LLC*, 2022 WL 3052135, at *8–

9.[11]  The MORs also reveal that between July 2022 and January 2023, the nominal rents collected

---

[10]    *See* No. 22-10082, ECF Doc. 441 ($3,688 collected by Westbank Holdings); No. 22-10083, ECF Doc. 42 ($1,698 collected by Cypress Park); No. 22-10084, ECF Doc. 42 ($3,195 collected by Liberty Park); No. 22-10085, ECF Doc. 41 ($7,673 collected by Forest Park); No. 22-10086, ECF Doc. 42 ($4,657 collected by Washington Park); and No. 22-10176, ECF Doc. 53 ($767 collected by Riverview).

[11]    As documented by this Court:

> As of March 2022, Westbank Holding, LLC's properties were in deplorable condition, most unfit for habitation, with active internal and external plumbing leaks and damage, excessive black mold growth throughout (on the surfaces of wall as well as inside the walls and ceilings), collapsed drywall on walls and ceilings, and standing sewage water inside and outside both vacant and occupied units.  [An independent inspector] testified that the extent of the damage due to water and sewage water infiltration—as examples, the sheer amount of black mold growing in units or the fact that floor joists from second-floor units have dropped into the first-floor units—was purely a function of the significant amount of time that maintenance in those units had been deferred.

> As of March 2022, Cypress Park Apartment II, LLC's property was also suffering from widespread neglect, including mold growth and water damage in a significant number of occupied and unoccupied units.

> As of March 2022, although the metal roof at the Liberty Park Apartments, LLC property showed no damage, ripped tarps covered both flat roofs on the buildings held by Forest Park Apartments, LLC, and Washington Place, LLC.  A makeshift lean-to had been constructed underneath the tarps to encourage water to drain of the tarps, but the wind had blown the tarps off and water had been allowed to pool on the roofs.  All three properties suffered from a significant amount of mold growth.

> As of April 2022, the Riverview Apartments, LLC property likewise suffered from life/safety, critical, and deferred-maintenance problems, including the presence of trash, active leaks, standing water, and mold growth.

*In re Westbank Holdings, LLC*, 2022 WL 3052135, at *8–9 (internal citations omitted).

in June 2022 decreased further; essentially, the Debtors were receiving only a few hundred dollars each month in rent subsidies and neither Trinity nor Metro Wide received any compensation under the Trinity Agreements.  [No. 22-10082, ECF Docs. 604, 607, 641, 647, 669, 752 & 802 (Westbank Holdings, LLC MORs)]; [No. 22-10083, ECF Docs. 49–56 (Cypress Park Apartments II, LLC MORs)]; [No. 22-10084, ECF Docs. 49–56 (Liberty Park Apartments, LLC MORs)]; [No. 22-10085, ECF Docs. 48–55 (Forest Park Apartments, LLC MORs)]; [No. 22-10086, ECF Docs. 49–57 (Washington Place, LLC MORs)]; [22-10176, ECF Docs. 60–65 & 68 (Riverview Apartments, LLC MORs)].

## CONCLUSIONS OF LAW

Trinity's compensation under the Trinity Agreements was based on the Debtors' rental income; to date, Trinity has not moved this Court for payment under those agreements.  On October 20, 2023, Metro Wide filed the Motion, requesting an allowed administrative expense claim of $137,842.97 for post-petition services provided to the Debtors pursuant to prepetition agreements with the Debtors and, later, under the Trinity Agreements.  [ECF Doc. 1142 & 1220].  Metro Wide attached 68 pages of invoices to the Motion, purporting to be for services rendered to various Debtors between the Petition Date and February 28, 2023 (this Court approved Tarantino's employment application on an interim basis on February 1, 2023).  [ECF Doc. 1142, Ex. B].  The Liquidating Trustee and Fannie Mae object to the relief sought in the Motion, asserting that (i) the Court neither approved Metro Wide's prepetition agreements nor approved Metro Wide as a professional of the estates, (ii) the amounts claimed in the invoices are not linked to actual, necessary costs and expenses to preserve the estates, and (iii) Metro Wide's services did not benefit the Debtors' estates.  [ECF Docs. 1168 & 1169].

Section 503 of the Bankruptcy Code governs the allowance of administrative expense claims. Section 503(b) provides that a court shall allow administrative expense claims for, among other things, "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). "[T]o qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee [or debtor-in-possession] that benefitted the estate." *Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.)*, 931 F.3d 432, 441 (5th Cir. 2019) (internal quotations and citation omitted).

"The requirement that expenses arise post-petition and as a result of actions taken by the debtor-in-possession is closely tied to the purpose of section 503(b)(1)(A)"—that is, to provide assurance of payment to incentivize third parties to provide necessary services to the debtor-in-possession so that it can continue to operate and generate funds for the payment of all creditors. *Id*. at 441–42 (internal quotations and citations omitted). "This incentive is not required, however, when the relevant obligation pre-dates the bankruptcy or when the debtor-in-possession does not want or need the services at issue." *Id*. at 442. "For this reason, an administrative priority claim must have arisen from a transaction with the debtor in possession, as opposed to the pre-petition debtor." *Id*. (internal quotations and citations omitted). Thus, "in the context of commercial transactions for goods and services, a creditor must show some inducement by the debtor-in-possession." *Id*. (citations omitted). A written post-petition agreement between a debtor-in-possession and a movant constitutes clear inducement. *See id*. (citation omitted).

In addition to arising post-petition and being induced by the debtor-in-possession, the administrative expenses claimed must also have benefited the estate. *Id*. at 443 (citing *In re Jack/Wade Drilling, Inc*., 258 F.3d 385, 387 (5th Cir. 2001)). That requirement "is merely a way

of testing whether a particular expense was truly necessary to the estate:  If it was of no benefit, it cannot have been necessary within the meaning of § 503(b)(1)(A)." *Id.* (internal quotations and citations omitted).  A loss to the creditor is not tantamount to a benefit to the estate.  *See id.* (citing *Toma Steel Supply, Inc. v. TransAmerican Natural Gas Corp. (In re TransAmerican Natural Gas Corp.)*, 978 F.2d 1409, 1419–20 (5th Cir. 1992)).  But "actual and necessary costs should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible."  *Id.* (quoting *Reading Co. v. Brown*, 391 U.S. 471, 483 (1968)).

"[T]he § 503 'actual and necessary' test is strictly construed so as to keep costs to a minimum."  *In re ASARCO LLC*, 441 B.R. 813, 824 (S.D. Tex. 2010) (citing *NL Indus. Inc. v. GHR Energy Corp.*, 940 F.2d 957, 966 (5th Cir. 1991)).  And the applicant has the burden to prove that its services provided a benefit to the estate.  *In re TransAmerican Nat. Gas Corp.*, 978 F.2d at 1416.

   **A.    Metro Wide Has Already Been Compensated for Property Management Services Rendered to the Estate During the Period Prior to the Court's Approval of Trinity as Property Manager and the Trinity Agreements.**

As detailed above, the Debtors did not file motions to retain Metro Wide as a professional of the estates under 11 U.S.C. § 327(a); rather, the Debtors filed a motion under 11 U.S.C. § 363 to use Fannie Mae's cash collateral and included Metro Wide's property management fees as a line item in the proposed budget.  [No. 22-10082, ECF Doc. 8; No. 22-10083, ECF Doc. 8; No. 22-10084, ECF Doc. 8; No. 22-10085, ECF Doc. 8; No. 22-10086, ECF Doc. 8].  Fannie Mae ultimately consented to each Debtor's use of its cash collateral for Metro Wide's property management services between January 27, 2022, and February 16, 2022, in the maximum monthly amount identified in the First Interim Budget and to the amounts identified in the Second Interim

Budget going forward after that.  [ECF Docs. 15, 19, 37 & 92].[12]   The MORs for January 2022

through May 2022 reveal that the Debtors paid Metro Wide for property management services

according to the Orders approving use of cash collateral issued by this Court.  [No. 22-10082, ECF

Docs. 85 (WBH Jan. '22), 122 (WBH Feb. '22), 145 (WBH Mar. '22), 297 (WBH Apr. '22)]; [No.

22-10083, ECF Docs. 32 (CP Jan. '22), 33 (CP Feb. '22), 36 (CP Mar. '22), 39 (CP Apr. '22), 41

(CP May '22)]; [No. 22-10084, ECF Docs. 32 (LP Jan. '22), 34 (LP Feb. '22), 37 (LP Mar. '22),

39 (LP Apr. '22), 41 (LP May '22)]; [No. 22-10085, ECF Docs. 32 (FP Jan. '22), 33 (FP Feb. '22),

36 (FP Mar. '22), 38 (FP Apr. '22), 40 (FP May '22)]; [No. 22-10086, ECF Docs. 32 (WP Jan.

'22), 34 (WP Feb. '22), 37 (WP Mar. '22), 39 (WP Apr. '22), 41 (WP May '22)].

### B.    Metro Wide Is Not Entitled to an Allowed Administrative Expense Claim Under the Trinity Agreements.

The Trinity Agreements, negotiated with much input from Fannie Mae and tenant

advocates, were approved by the Court and remained in effect from June 2022 through January

2023.  The invoices attached as Exhibit B to the Motion appear to charge each Debtor the monthly

minimum amount for back-end support services and also for vehicle-leasing and other additional

or optional services such as telephone-answering services.  [ECF Doc. 1142, Ex. B].[13]

---

[12]    After Riverview Apartments, LLC filed a petition for bankruptcy relief, it filed its own emergency motion for use of cash collateral; its proposed interim budget for the period of February 24, 2022 to March 16, 2022, proposed that the Debtor would be required to pay no property management fees.  [No. 22-10176, ECF Doc. 11].  The first approval of management fees to be paid by Riverview Apartments came with the Court's approval of Trinity as the Debtors' property manager and the Trinity Agreements.

[13]    Under the Trinity Agreements, "[s]ubject to [Trinity's] commercially reasonable determination that there is a specific need for vehicles or golf carts . . . for property management," Metro Wide would provide those vehicles and invoice Trinity at lease rates identified on Schedule C of the Trinity Agreements.  [ECF Doc. 298, Exs. A–F, § 3.13].  The invoices supplied by Metro Wide in support of its administrative expense claim identify specific vehicles allegedly provided to Trinity for property management during the months of June through August 2022; however, invoices for September through January 2022 do not identify which vehicles Metro Wide supplied to Trinity for property management.  [ECF Doc. 1142, Ex. B].  No evidence was supplied by Metro Wide indicating that Trinity requested use of vehicles for property management as required by the Trinity Agreements, and the evidence supplied by the Liquidating Trustee in the form of

As detailed above, the Debtors collected nominal rents between June 2022 and January 2023 months because the majority of the units were unlivable.  The record clearly reflects that during the time period that the Trinity Agreements were in effect, the conditions at the Debtors' properties were deplorable:  water main leaks, sanitary sewer water standing and ponding, rampant mold growth inside units, vandalism—few tenants remained and close to zero rents were being collected.  *See generally In re Westbank Holdings, LLC*, No. 22-10082, 2022 WL 3052135, at *7– 9 & n.6 (E.D. La. Aug. 1, 2022).  The chapter 11 trustee worked during that time with tenants' rights advocates and the City of New Orleans to relocate tenants to alternative housing while he secured the properties and prepared them for auction.  The MORs reveal that the chapter 11 trustee expended estate resources for construction and security services—not property management services, as none were needed.

Although the Court finds that the Trinity Agreements themselves evidence post-petition inducement of services by the Debtors, to allow an administrative expense claim under § 503(b), the Court is also required to assess the benefit to the Debtors' estates provided by Metro Wide's services to determine the necessity of the services.  The Court questions the legitimacy of Metro Wide's invoices for property management services when no operations were occurring at the Debtors' properties.[14]  Given the conditions of the Debtors' properties at the time and the utter

---

sworn deposition testimony from Trinity's principal indicates that Trinity only requested and used one vehicle for approximately two months.  [ECF Doc. 1168, Ex. C, Dep. Tr. 44:14–46:2, 94:11–25 (Feb. 24, 2023)].  Moreover, the evidence supplied by the Liquidating Trustee also revealed that Trinity only utilized Metro Wide's offices for approximately three months and were never able to utilize Metro Wide's facilities on-site at any of the Debtors' properties.  [ECF Doc. 1168, Ex. C, Dep. Tr. 25:13–26:24 (Feb. 24, 2023)].

[14]     As observed by the Liquidating Trustee upon his review of Metro Wide's invoices:

[W]hen one aggregates the proposed monthly vehicle charges on the Invoices from the period September 2022 through February 2023, the total is $10,103.80 per month.  For context, the total monthly cost of the entire fleet of vehicles listed on the Vehicle Schedule of the Trinity Agreements is $12,932.85.  This means that Metro Wide was, from

lack of any need for property management services, the Court finds that any services allegedly rendered by Metro Wide provided no benefit to the estate and, therefore, were not necessary within the meaning of § 503(b)(1)(A).

For the foregoing reasons,

**IT IS ORDERED** that the Motion is **DENIED**;

**IT IS FURTHER ORDERED** that the Liquidating Trustee shall serve this Order via first-class U.S. Mail on the required parties who will not receive a copy through the Court's CM/ECF system pursuant to the Federal Rules of Bankruptcy Procedure and this Court's Local Rules and file a certificate of service to that effect within three (3) days.

New Orleans, Louisiana, June 6, 2024.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

---

September 2022 through the Termination Date (and past that date, through February 28, 2023), billing the estate for almost every vehicle on the Vehicle Schedule. [ECF Doc. 1168, ¶ 21(e)].